[No. A068116. First Dist., Div. Three. Feb. 21, 1997.]

EDWIN DAUM et al., Plaintiffs and Appellants, v.
SPINECARE MEDICAL GROUP, INC., et al., Defendants and
Respondents.

**COUNSEL**

Gerald A. Clausen for Plaintiffs and Appellants.

James M. Goodman and Jan E. Ellard for Defendants and Respondents.

**OPINION**

PARRILLI, J.—In *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1] (*Cobbs*), and *Arato* v. *Avedon* (1993) 5 Cal.4th 1172 [23 Cal.Rptr.2d 131, 858 P.2d 598] (*Arato*), our Supreme Court established a carefully limited role for expert testimony in determining the scope of a physician's duty to disclose information to a patient before undertaking a medical procedure. In neither of those cases was the court presented with a legislatively prescribed disclosure. Here we hold that when the duty to disclose certain information is imposed by statute or regulation, it is error to require the jury to consider only expert testimony in determining whether communication of that information was necessary for the patient's informed consent. Further, in view of the limitations discussed in *Cobbs* and *Arato*, we hold a jury may not be restricted to considering expert opinion in determining whether the timing and method of a physician's disclosure was adequate.

Appellants Edwin and Michele Daum sued SpineCare Medical Group, Inc., and Drs. John Pletz and Noel Goldthwaite (collectively, SpineCare) for medical malpractice. The action arose out of unsuccessful spinal fusion surgery on Mr. Daum; Michele Daum asserted a cause of action for loss of consortium. The Daums' theory of liability at trial was restricted to Spine-Care's failure to obtain informed consent for the implantation of a fixation device in Mr. Daum's back. The Daums did not dispute that Mr. Daum agreed to the use of the device, known as the Wiltse II. However, they claimed he was not informed the device was considered investigational or experimental by the Food and Drug Administration (FDA), nor was he told his surgery was part of an FDA-approved clinical investigation of the Wiltse II conducted by SpineCare.

California statutes, and federal regulations incorporated in the manufacturer's protocol for clinical trials of the Wiltse II, require that patients be informed of its investigational status. The patients must consent in writing to participate in the trial, and must be given a copy of their consent form. Mr. Daum did not sign a written consent form disclosing the investigational status of the Wiltse II until shortly before surgery, when he was lying on a gurney. Soon thereafter he received an anesthetic that had a retroactive memory-blocking effect. After surgery he had no memory of signing the form, nor was he given a copy. The surgeon, Dr. Goldthwaite, believed he had orally informed Mr. Daum the device was investigational sometime before the day of surgery. Mr. Daum denied this. The parties' experts disagreed on whether the disclosure to Mr. Daum was within the standard of care. The jury returned a special verdict finding SpineCare had disclosed to Mr. Daum "all relevant information which would enable him to make an informed decision regarding the proposed operation." Judgment for Spine-Care followed.

On appeal, the Daums contend the trial court improperly instructed the jury that the standard of care must be determined solely from expert testimony, and erroneously refused the Daums' proposed instructions on negligence per se and battery. They also challenge the nonsuit granted to Dr. Pletz during trial. We conclude the nonsuit was proper, and the battery instruction did not apply in this case. However, it was prejudicial error to require the jury to determine the standard of care governing informed consent exclusively from expert testimony, and to refuse to instruct on negligence per se. Therefore, we affirm the judgment of nonsuit as to Dr. Pletz and otherwise reverse.

## I. BACKGROUND

### A. *Mr. Daum's Earlier Treatment*

Mr. Daum worked for IBM as a designer and teacher of training courses for the company's employees from 1962 until his 1989 surgery at SpineCare. He first experienced back problems on a teaching trip in the spring of 1985. In November 1985 he had surgery to partially remove a herniated disc between his fifth and sixth lumbar vertebrae. The operation relieved his discomfort and he was able to return to work until March 1987, when he was struck from behind in an automobile accident. Mr. Daum immediately felt a sensation of paralysis in his legs, which subsided the same day but was followed by persistent pain in his back and right leg. He missed a considerable amount of work. Despite physical therapy, a doctor discovered atrophy of Mr. Daum's right thigh muscle in February 1988. Again, a herniated disc

was found between the fifth and sixth lumbar vertebrae. Mr. Daum discussed with Dr. Golden, his surgeon, whether to simply remove additional disc material or fuse the vertebrae. He decided on the simpler procedure, although he knew that removal of more disc material might lead to instability requiring a fusion.

Dr. Golden performed the second disc operation in March 1988. It provided some relief, but Mr. Daum's back problems recurred. He returned to work in July 1988, but only part time. Dr. Golden ultimately concluded a fusion operation was necessary, and sent Mr. Daum to another neurosurgeon, Dr. Prolo, for a second opinion in June 1989. Dr. Prolo examined Mr. Daum and recommended a posterior lumbar interbody fusion to stabilize the joint between the fifth and sixth lumbar vertebrae. This procedure would involve implanting blocks of bone obtained from cadavers. No metallic fixation device would be used, but a cast or brace would be needed to immobilize the spine. Mr. Daum took some time to consider this option. In the fall of 1989, he decided to have the surgery and scheduled an appointment with Dr. Golden. However, Dr. Golden had retired and Mr. Daum lacked confidence in the doctor who had taken over the practice. Mr. Daum went to his family doctor for a referral to another surgeon, and his doctor scheduled an appointment for him at SpineCare.

## B. *Treatment at SpineCare*

SpineCare is a multidisciplinary practice founded by Dr. Arthur White to specialize in the treatment of spinal problems. Its staff includes internists, surgeons, anesthesiologists, psychiatrists, a chiropractor, and rehabilitation experts. The great majority of its patients have previously undergone unsuccessful spine surgery. Mr. Daum met with Drs. Pletz and Goldthwaite at SpineCare on October 11, 1989. Dr. Pletz, an internist, was responsible for initially evaluating Mr. Daum's condition, for managing any nonsurgical, conservative aspects of his treatment, and for some aspects of postoperative treatment. Dr. Goldthwaite was the orthopedic surgeon who eventually operated on Mr. Daum's spine.

At the meeting on October 11, the doctors took Mr. Daum's history, performed a physical examination, and concluded that further diagnostic tests were needed. Mr. Daum remembered discussing fusion surgery, and being told a metal fixation device would be used. Dr. Pletz testified no decision on the necessity of surgery was made at the first meeting, and there was no need to have discussed instrumentation with Mr. Daum. Dr. Pletz did not believe they discussed the Wiltse II. Dr. Goldthwaite testified he had contemplated using the Wiltse II at the first meeting "because . . . we were

just coming on line with that, and it would be the ideal instrumentation to use in a case like that." He did not remember if he discussed the Wiltse II with Mr. Daum on October 11, but believed they had discussed surgery in a general way.

The Wiltse II consists of metal screws and rods implanted in the spine to stabilize the patient's vertebrae and facilitate fusion. The screws are placed in a part of the vertebra called the pedicles, which project on either side from the body of the vertebra. The Wiltse II was an improvement over earlier fixation devices that used screws and plates because its rods could be bent to conform to the curvature of the patient's spine. In 1989 the Wiltse II was considered an experimental or investigational device by the FDA.[1] Spine-Care became an approved investigator for clinical trials of the Wiltse II on October 27, 1989. In doing so, SpineCare agreed to follow the manufacturer's protocol which had been approved by the FDA. Included in the protocol was a written consent form telling the patient that surgery using the Wiltse II device was part of an investigational study. Mr. Daum was the third or fourth SpineCare patient to receive a Wiltse II implant.

Mr. Daum met with Drs. Pletz and Goldthwaite again on November 2, 1989, after undergoing the tests prescribed at their first meeting. At trial, he had difficulty remembering what happened at the second meeting; he was unsure whether he saw Dr. Pletz, Dr. Goldthwaite, or both. Mr. Daum's testimony from an earlier trial in 1991 arising from his car accident was read to the jury. There, he said he went back to Dr. Goldthwaite after his tests were done, and Dr. Goldthwaite explained he would place steel rods and screws in Mr. Daum's back "and that was [a] rather heavy and involved procedure because they had to operate from the front and back." Dr. Pletz's progress note on the November 2 meeting showed that he and Dr. Goldthwaite saw Mr. Daum together. Dr. Pletz noted Mr. Daum needed a multilevel fusion with hardware and wanted to proceed with the surgery as soon as it was practical. Dr. Pletz said no decision had yet been made to use the Wiltse II; he did not think they had discussed the Wiltse II at that meeting. Dr. Goldthwaite testified that on November 2 he told Mr. Daum he was going to have a Wiltse II surgery; he thought they had discussed the hardware. He could not be sure he had told Mr. Daum the device was experimental or investigational at this meeting, but he "would expect so."

Mr. Daum met again with Dr. Pletz on November 14, 1989, and they discussed the planned surgery. Dr. Pletz covered the general risks of surgery,

---

[1]No device using pedicle screws was approved for use by the FDA at the time of Mr. Daum's surgery. Nevertheless, pedicle screws had been used since the 1950's, and Dr. White testified their use was standard at every spine center in the country. He called them "the penicillin for the spine surgeon."

including those associated with metallic implants, but did not specifically refer to the Wiltse II device. Dr. Pletz's notes for the November 14 meeting did not show Dr. Goldthwaite was present, and Dr. Pletz's memory on that point was uncertain. However, Dr. Pletz did remember a meeting, either on November 14 or shortly thereafter, at which Mr. Daum asked questions about the device and Dr. Goldthwaite showed him a model of it, explaining it was new and had the advantage of using bendable rods. He remembered Mr. Daum commenting that the screws looked like woodscrews. Dr. Goldthwaite thought he was at the November 14 meeting. At his deposition, he had said he met with Mr. Daum on December 4 (the day before the surgery) and not on November 14, but at trial he believed he saw Mr. Daum on November 14 and not on December 4.

Mr. Daum signed two informed consent forms on November 14, 1989. One of these, entitled "Informed Consent for Lumbar Spine Surgery," discussed possible complications and referred to the implantation of metal rods and screws. It did not identify the Wiltse II device or mention its investigational status. The other form, entitled "Informed Consent for Lumbar Anterior Interbody Fusion," noted an incision would be made in the abdomen to provide access to the spine. It did not mention any fixation device. These forms were signed by Dr. Goldthwaite as the physician, and Julie Tuiasosopo as a witness. Ms. Tuiasosopo, a registered nurse employed by SpineCare, testified she was not responsible for explaining any of the procedures or devices mentioned on the forms, and would refer questions about the described risks to the doctors. Dr. Goldthwaite said he never discussed these forms specifically with Mr. Daum, but did discuss their content with him. Dr. Goldthwaite acknowledged the November 14 forms were insufficient to comply with the Wiltse II protocol.

Mr. Daum arrived at the hospital for surgery at 6 a.m. on December 5, 1989, accompanied by his wife. He changed into a hospital gown, gave his personal effects (including his glasses)[2] to a nurse, lay down on a gurney, and fell asleep. The nurse gave the personal effects to Mrs. Daum about 6:15 a.m. At 7 o'clock Dr. Groger, a vascular surgeon who assisted Dr. Goldthwaite in the anterior aspect of the surgery, visited Mr. and Mrs. Daum and explained to them his role in the surgery and the risks involved in that aspect. Dr. Goldthwaite thought he himself had also visited Mr. Daum at around 7 o'clock on the morning of surgery. At 7:20 a.m., the anesthesiologist ordered three drugs for Mr. Daum, and the nurse administered the medication at 7:30 a.m. One of the anesthetics, Versed, produces retrograde amnesia, causing the patient to forget what happened not only after the shot but also at least a half hour to an hour before it.

[2] The record does not disclose whether Mr. Daum, who was 53 at the time of this surgery, needed his glasses for reading.

Sometime on December 5, Mr. Daum signed a seven-page Wiltse II consent form, which clearly stated the device was investigational and the surgery was part of a study to determine the device's safety and effectiveness. This form outlined specific risks and noted alternatives to use of the Wiltse II device. It was accompanied by a list of "Rights of Human Subjects in Medical Investigations." Mr. Daum had no memory of discussing or seeing this form on the morning of surgery, although he recognized his signature and acknowledged the date next to it was written the way he would have written it. A forensic document expert testified the signature was Mr. Daum's, and showed no changes that might indicate Mr. Daum was unable to see or read the document. Mr. Daum was not given a copy of the form. The first time he saw it was after the car accident litigation, when his attorneys sent him a copy.[3] Mr. Daum testified he was "totally shocked and angry. . . . livid" when he read the Wiltse II consent form.

Physician assistant Marc Garner signed the Wiltse II consent form as a witness. It was his responsibility to make sure all necessary paperwork was completed before surgery, including any unsigned consent forms. Mr. Garner said it was not his responsibility to explain the contents of informed consent forms to patients. He had no recollection of witnessing Mr. Daum's consent form or seeing Mr. Daum sign the form. Based on his usual practice in the operating area, Mr. Garner believed he would probably have presented the form to Mr. Daum for signing between 6:45 and 7 a.m., and no later than 7:15 a.m. Dr. Goldthwaite also signed the Wiltse II consent form. He testified he had not given the form to Mr. Daum, and he did not remember seeing Mr. Garner with the form on the morning of surgery. Dr. Goldthwaite believed Mr. Garner gave him the form to sign "later in the morning," perhaps after the operation was completed.

Mr. Daum testified that before the day of surgery, he was never told the Wiltse II was an experimental or investigational device. Mrs. Daum testified her husband never mentioned his surgery at SpineCare would be experimental or investigational. Dr. Goldthwaite testified he expected his patients to have the Wiltse II consent form a week before surgery. However, he did not think the standard of care required giving the form at that time, as long as the doctor thoroughly explained the situation and all substantial risks and benefits to the patient in advance. Dr. Goldthwaite was "very confident" he had such a full discussion with Mr. Daum, but could not say exactly when it took place. He assumed it was on November 14. Dr. White testified that the most reasonable time to have given Mr. Daum the Wiltse II consent form was

---

[3]Mr. Daum was represented by the same law firm in the accident litigation and in this medical malpractice action. Apparently, his counsel did not receive a copy of the Wiltse II consent form until shortly after Dr. Goldthwaite testified in the accident trial.

whenever Dr. Goldthwaite told him he would be participating in a clinical trial. Dr. White agreed Mr. Daum should have been told this at least a week before surgery. However, Dr. White knew of nothing in the Wiltse II protocol or any federal regulation requiring consent forms to be signed by a certain time before surgery. He said that for years consents were routinely obtained on the morning of surgery. One of his goals in founding SpineCare was to educate patients earlier in the process.

A year after the surgery, infection was discovered in the area of the fixation device. Dr. Goldthwaite removed the device and drained a large amount of pus from the wound. After several further surgeries, the wound finally healed late in 1991. Dr. Goldthwaite believed that during the Wiltse II surgery Mr. Daum contracted a deep bone infection, which would probably persist for the rest of his life.

## C. *Plaintiffs' Experts*

Dr. Reese Jones, a psychiatrist at the University of California at San Francisco (UCSF), testified as an expert witness for Mr. Daum. Dr. Jones chaired the university's committee on human research, which was responsible for reviewing human research proposals and protocols. He had himself been an investigator in FDA-approved clinical trials. Dr. Jones stated it was below the standard of care to ask Mr. Daum to sign the Wiltse II consent form on the morning of surgery. Both regulations and ethical norms require a patient to consent freely, without duress, and in circumstances in which it would be easy to say no, according to Dr. Jones. He agreed that obtaining informed consent orally is important, but not necessarily more important than written consent. Written consent is legally required, provides the patient with a document to refer to if questions arise, and gives both patient and doctor tangible evidence that informed consent was obtained. While the regulations do not provide a time line for obtaining consent, Dr. Jones said ethical considerations require giving the patient enough time to deliberate and discuss the treatment options.

Dr. David Rutberg, a neurosurgeon, also testified as an expert for Mr. Daum. Dr. Rutberg had performed many spinal surgeries, and assisted orthopedic surgeons in his medical group with fusion operations. He had not personally participated in clinical trials, but in forming his opinion in Mr. Daum's case he conferred with an orthopedic surgeon in his group who had patients in clinical investigations. Dr. Rutberg stated it was below the standard of care to give Mr. Daum the Wiltse II consent form on the morning of surgery, and would have been below the standard of care even if Mr. Daum had his glasses and was not medicated. Dr. Rutberg believed orally

obtaining informed consent was insufficient, because studies have shown patients do not remember much of what they are told by physicians, and a written document drives home the importance of the patient's decision. A patient who is being prepared for surgery is not in the proper state of mind to consider the issues presented by a consent form for experimental surgery, said Dr. Rutberg.

### D. Defense Experts

Three independent physician experts testified for the defense: Dr. Lowell Young, chief of the division of infectious diseases at California Pacific Medical Center in San Francisco and a clinical professor of medicine at UCSF; Dr. Donald Nagel, a general orthopedic surgeon whose practice included spinal surgery; and Dr. Daniel Capen, an orthopedic spinal surgeon and an associate clinical professor of orthopedic surgery at the University of Southern California.

Dr. Young had prescribed drugs considered investigational by the FDA and had been a designated investigator for such drugs. He often obtained signed consents just before treatment began, though he would have previously discussed the FDA protocols with the patient. In view of Dr. Goldthwaite's testimony that he had orally informed Mr. Daum the Wiltse II was an investigational device, Dr. Young did not believe it was a breach of the standard of care to give Mr. Daum the Wiltse II consent form on the day of surgery. Dr. Young stated the most important thing was for the surgeon to have fully explained the procedure to the patient. He agreed it was good policy to obtain the patient's consent to participate in a clinical investigation at an early stage. However, he believed there was less urgency to obtain consent in advance when the procedure involved was merely a logical extension of an existing treatment, rather than a radical new treatment. Dr. Young said the Wiltse II device was a logical extension of a number of earlier spinal fixation devices.

Dr. Nagel had done research projects involving investigational fixation devices in orthopedic surgery. He testified that if Dr. Goldthwaite had discussed the investigational nature of the Wiltse II device with Mr. Daum in advance, it was not below the standard of care to give him the Wiltse II consent form on the morning of surgery. Dr. Nagel believed verbal communication is more important for informed consent than written forms; the physician can tell if the patient is paying attention, whereas some patients sign consent forms without reading them. Dr. Nagel stated patients frequently sign consent forms within the hour before surgery; this is the way things are done in the practice of medicine. He agreed it would have been

reasonable, and ideal, for Mr. Daum to receive the consent form earlier. However, even if Mr. Daum had learned for the first time on the day of surgery that the Wiltse II was an investigational device, Dr. Nagel did not believe the standard of care would have been breached. Because the Wiltse II was so similar to other spinal fixation devices, he did not think "the fact that it's investigational is a big deal."

Dr. Capen was himself an investigator in Wiltse II clinical trials. He testified it was within the standard of care to have Mr. Daum sign the Wiltse II consent form on the day of surgery if Dr. Goldthwaite had previously informed him of the procedure's risks and benefits and the Wiltse II's status as an investigational device. Dr. Capen said it would have been below the standard of care if Mr. Daum saw the form for the first time on the day of surgery without any such previous discussion. Dr. Capen would not expect Mr. Daum to have remembered signing the form because of the Versed. Dr. Capen believed written paperwork was the least important part of obtaining informed consent; the one-on-one discussion between physician and patient is the most important thing. However, Dr. Capen also noted it is well documented that patients retain only a small percentage of what their doctors tell them, and many are intimidated by the physician when discussing surgery. Dr. Capen ordinarily gave his patients the Wiltse II consent form five to ten days in advance of surgery, at the last preoperative visit. Dr. Capen considered the Wiltse II device an extension of earlier spinal fixation technology. However, he acknowledged that no fixation device using pedicle screws had been approved by the FDA.

## II. Discussion

### A. *The Jury Instructions*

#### 1. *Informed Consent and Expert Testimony*

In *Cobbs, supra*, 8 Cal.3d 229, the court rejected the rule that the scope of disclosure in informed consent cases is measured by the custom of the medical community. "Unlimited discretion in the physician is irreconcilable with the basic right of the patient to make the ultimate informed decision regarding the course of treatment to which he knowledgeably consents to be subjected." (*Id.* at p. 243.) ■ Nevertheless, *Cobbs* fashioned a two-part test that links the duty to disclose some matters to the standard of professional practice.

First, a physician must disclose to the patient the potential of death, serious harm, and other complications associated with a proposed procedure.

(*Cobbs, supra,* 8 Cal.3d at p. 244.) Expert testimony on the custom of the medical community is not necessary to establish this duty. (*Spann* v. *Irwin Memorial Blood Centers* (1995) 34 Cal.App.4th 644, 656 [40 Cal.Rptr.2d 360]; *Willard* v. *Hagemeister* (1981) 121 Cal.App.3d 406, 418 [175 Cal.Rptr. 365].) Second, "[b]eyond the foregoing minimal disclosure, a doctor must also reveal to his patient such additional information as a skilled practitioner of good standing would provide under similar circumstances." (*Cobbs, supra,* at pp. 244-245.) Therefore, expert testimony is relevant and admissible to determine the duty to disclose matters other than the risk of death or serious harm and significant potential complications. (*Arato, supra,* 5 Cal.4th at p. 1191; *Spann* v. *Irwin Memorial Blood Centers, supra,* at p. 657, fn. 13.)

In *Arato,* the Supreme Court observed that the *Cobbs* test has been incorporated in BAJI No. 6.11, and is the accepted standard for measuring the adequacy of disclosure in informed consent cases. (*Arato, supra,* 5 Cal.4th at pp. 1190-1191.) The *Arato* court endorsed *Cobbs's* position that the standards of the medical community do not absolutely govern the duty of disclosure. "We underline the limited and essentially subsidiary role of expert testimony in informed consent litigation. As we cautioned in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, a rule that filters the scope of patient disclosure entirely through the standards of the medical community ' "arrogate[s] the decision [of what to disclose] . . . to the physician alone." ' (*Id.* at p. 243.) We explicitly rejected such an absolute rule as inimical to the rationale and objectives of the informed consent doctrine; we reaffirm that position." (*Arato, supra,* at p. 1191, brackets and ellipsis in original.) However, *Arato* also reaffirmed and applied the second part of the *Cobbs* test, which is based on the standard of professional practice. "[I]n an appropriate case, the testimony of medical experts qualified to offer an opinion regarding what, if any, disclosures—in addition to those relating to *the risk of death or serious injury and significant potential complications posed by consenting to or declining a proposed treatment*—would be made to the patient by a skilled practitioner in the relevant medical community under the circumstances, is relevant and admissible." (*Ibid.,* italics in original.) On the facts before it, the *Arato* court held expert testimony was properly admitted on the issue of whether the defendant physicians were required to disclose statistical life expectancy data associated with the cancer for which the patient was being treated. (*Id.* at pp. 1191-1192.)

 Here the trial court gave BAJI No 6.11, which informed the jury of the *Cobbs* test.[4] Over the Daums' objection, the court followed this instruction with BAJI No. 6.30: "You must determine the standard of professional

---

[4]The instruction was as follows: "Except as hereinafter explained, it is the duty of the physician to disclose to the patient all material information to enable the patient to make an

learning, skill and care required of the defendants only from the opinions of the physicians including the defendant who have testified as expert witnesses as to such standard. [¶] You should consider each such opinion and should weigh the qualifications of the witness and the reasons given for his opinion. Give each opinion the weight to which you deem it entitled. [¶] You must resolve any conflict in the testimony of the witnesses by weighing each of the opinions expressed against the others, taking into consideration the reasons given for the opinion, the facts relied upon by the witness, and the relative credibility, special knowledge, skill, experience, training and education of the witness."

The issue of whether BAJI No. 6.30 is properly given in conjunction with BAJI No. 6.11 was mentioned, but not resolved, in *Arato, supra*, 5 Cal.4th 1172. The Court of Appeal had ruled it was error to read the jury BAJI No. 6.30, but the Supreme Court observed the instruction properly applied to the plaintiffs' alternate theory of "negligent medical mismanagement" and had been approved by their counsel, so any error on the point was invited. (*Arato, supra*, 5 Cal.4th at p. 1192, fn. 12.) The Daums distinguish this case from *Arato* on the grounds that lack of informed consent was their only theory of liability, and they objected to giving the jury BAJI No. 6.30. They contend the instruction elevated the role of expert testimony beyond the secondary function outlined in *Cobbs* and *Arato*. Furthermore, they observe there was little dispute in this case regarding what information Mr. Daum should have received; the contested issue was whether he was informed of the investigational status of the Wiltse II in a timely and legally effective

informed decision regarding the propose[d] operation or treatment. [¶] Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure. To be material a fact must also be one which is not commonly appreciated. [¶] There is no duty to make disclosure of risks when the patient requests that he not be so informed or where the procedure is simple and the danger remote and commonly understood to be remote. [¶] Likewise, there is no duty to discuss minor risks inherent in common procedures, when such procedures very seldom result in serious ill effects. [¶] However, when a procedure inherently involves a known risk of death or serious bodily harm, it is the physician's duty to disclose to the patient the possibility of such outcome and to explain in lay terms the complications that might possibly occur. The physician or surgeon must also disclose such additional information as a skilled practitioner of good standing would provide under the same or similar circumstances. [¶] A physician has no duty of disclosure beyond that required of physicians of good standing in the same or similar locality when he relied upon facts which would demonstrate to a reasonable [person] that the disclosure would so seriously upset the patient that the patient would not have been able to rationally weigh the risks of refusing to undergo the recommended operation. [¶] Even though the patient has consented to a proposed treatment or operation, the failure of the physician to inform the patient as stated in this instruction before obtaining such consent is negligence and renders the physician subject to liability for any injury caused by the operation if a reasonably prudent person in the patient's position would not have consented to the operation if he had been adequately informed of all the significant perils." (BAJI No. 611.)

fashion. SpineCare argues that when and how investigational consent paper-work must be signed is a subject beyond the risk of death or serious harm and significant potential complications, and outside the common experience of lay people. Therefore, SpineCare asserts the second part of the *Cobbs* test applies, the standard of care is in the exclusive domain of expert testimony, and the jury was properly charged with BAJI No. 6.30.

We conclude BAJI No. 6.30 was inappropriate in this case, regarding both the substance and the manner of SpineCare's disclosure to Mr. Daum. Disclosure of the Wiltse II's investigational status was required by statute and regulation, as we discuss at length in connection with the negligence per se instruction requested by the Daums. Therefore, it was error to require the jury to consider only testimony by medical experts in deciding whether Mr. Daum was given all the information relevant to his decision on the implantation of the device.[5] It was also improper to limit the jury to expert testimony in deciding whether the timing and manner of the disclosure to Mr. Daum was sufficient to allow him to give his fully informed consent. This is not a matter beyond the understanding of lay people; on the contrary, the medical profession must conform its methods of disclosure to the needs and understanding of patients. Allowing physician experts to provide the only evidence for the jury's deliberations on this issue would be inconsistent with the cardinal principle guiding the Supreme Court in *Cobbs*—the patient's right of self-determination prevails over the medical profession's discretion on the basic elements of disclosure. (See *Cobbs, supra,* 8 Cal.3d at pp. 242-244.) "In sum, the patient's right of self-decision is the measure of the physician's duty to reveal. . . . The scope of the physician's communications to the patient, then, must be measured by the patient's need . . . ." (*Cobbs, supra,* at p. 245; see also *Arato, supra,* 5 Cal.4th at p. 1191 ["the

---

[5]The proper role of expert testimony in cases where the standard of care is legislatively prescribed was discussed in *Huang* v. *Garner* (1984) 157 Cal.App.3d 404 [203 Cal.Rptr. 800], a case involving building code violations. The court held that expert testimony was not required, but would be admissible to rebut the presumption of negligence per se, as contemplated by Evidence Code section 669, subdivision (b)(1). (*Huang* v. *Garner, supra,* at pp. 415-416.) Under that provision, the presumption of negligence may be rebutted by proof that "[t]he person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." (Evid. Code, § 669, subd. (b)(1).) Thus, when negligence per se is shown, expert testimony is admissible, but not conclusive, regarding whether the statutory or regulatory violation was justified.

We emphasize that not every technical regulatory violation is presumptively negligent. The next part of our opinion discusses and applies the elements necessary to establish negligence per se. The requirement of a causal link between the violation and the injury is a particularly significant check on liability arising from trivial transgressions.

physician will for the most part be guided by the patient's decisional needs"].)[6]

██ ██ Our Supreme Court has refrained from prescribing specific disclosures by physicians to patients. "Rather than mandate the disclosure of specific information as a matter of law, the better rule is to instruct the jury that a physician is under a legal duty to disclose to the patient all material information—that is, 'information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure'—needed to make an informed decision regarding a proposed treatment." (*Arato, supra,* 5 Cal.4th at p. 1186, quoting BAJI No. 6.11.) However, the Legislature and the FDA, in their wisdom, have decreed that patients participating in clinical trials of investigational devices must be informed in writing, with a copy for themselves, of the nature of the trial and the device. Neither physicians nor courts are free to disregard these requirements. Yet, the net effect of giving BAJI Nos. 6.11 and 6.30 in this case was to permit the medical experts alone to control the jury's consideration of what Mr. Daum had to be told about his Wiltse II surgery, and how the disclosure should have been made. Moreover, the special verdict form did not require the jury to determine whether Mr. Daum had been advised his surgery was part of a clinical trial of an investigational device. It only asked whether he was given "all relevant information," and "relevance" was determined by the experts. This procedure eviscerated the statutory and regulatory requirements, and overstepped the limits imposed by *Cobbs* and *Arato* on the role of experts in establishing standards of disclosure.

---

[6]We observe there is potential for confusion in the use notes following BAJI Nos. 6.11 and 6.30, concerning the role of expert testimony on the issue of informed consent. BAJI No. 6.11, incorporating the two-part *Cobbs* test, is followed by a note stating: "Ordinarily it is for the jury to determine without expert assistance whether all material information has been disclosed. However, the standard of care may require the professional to make additional, or perhaps fewer, disclosures. . . . [I]f expert evidence concerning what is required by the standard of care is received, BAJI 6.30 will be required." (Use Note to BAJI No. 6.11 (8th ed. 1994) pp. 199-200, citing *Arato, supra,* 5 Cal.4th 1172.) However, the Use Note to BAJI No. 6.30 states: "It is suggested that, in cases in which the plaintiff seeks recovery of damages not only on a claim of malpractice in treating or operating but also on a claim of defendant's failure to secure an informed consent to the treatment or operation, BAJI 6.30 be preceded by the following: [¶] 'Except as to the claim of the defendant's failure to disclose all relevant information necessary for the plaintiff to make an informed decision regarding the proposed [treatment] [operation], you are instructed that:' " (Use Note to BAJI No. 6.30 (8th ed. 1994) p. 219.) Thus, in cases subject to the second part of the *Cobbs* test, where expert testimony is relevant and admissible, the Use Note to BAJI No. 6.30 forbids what the Use Note to BAJI No. 6.11 requires.

We suggest amendment of these notes to reflect more accurately the rules laid down in *Cobbs* and *Arato,* and our application of those rules to the timing and manner of disclosure.

## 2. *Negligence Per Se*

 The Daums requested instructions covering a number of California statutes and federal regulations bearing on clinical trials of investigational devices. In conjunction with those instructions, they asked for BAJI No. 3.45 on negligence per se. Under the negligence per se doctrine, which is codified by Evidence Code section 669, negligence is presumed if the plaintiff establishes four elements: (1) the defendant violated a statute or regulation; (2) the violation caused the plaintiff's injury; (3) the injury resulted from the kind of occurrence the statute or regulation was designed to prevent; and (4) the plaintiff was one of the class of persons the statute or regulation was intended to protect. The first two elements are normally questions for the trier of fact. The last two elements are determined by the trial court as a matter of law. (*DiRosa* v. *Showa Denko K.K.* (1996) 44 Cal.App.4th 799, 805-806 [52 Cal.Rptr.2d 128]; *Huang* v. *Garner, supra,* 157 Cal.App.3d 404, 413-414.) Accordingly, BAJI No. 3.45 covers only the first two elements of negligence per se.[7]

 The trial court refused the negligence per se instruction and most of the Daums' proposed instructions on the statutes and regulations. However, immediately after reading BAJI No. 6.30 on expert testimony and the standard of care, the court read the jury portions of some of the statutory and regulatory material requested by the Daums, prefaced with an introduction given on the court's own motion, as follows:

"Now, the following extracts from the California Health and Safety Code, and the U.S. Code of Federal Regulations are included in these instructions for whatever use you may wish to make of them in your deliberations. [¶] I would remind you, however, that these legislative and administrative provisions were not intended—nor should you consider them—as determinative of the issues of the standard of care, negligence or informed consent. That determination is to be made in accordance with the instructions I have just read to you. [¶] So you say why am I reading these to you then? The answer is, for example, that you might wish to consider these statutes and regulations for whatever bearing they might have upon your determination and assessment of the conflicting opinions by the medical experts in this case. [¶]

---

[7]As conformed to the circumstances of this case, BAJI No. 3.45 would have told the jury: "If you find that a party to this action violated the statutes or regulations just read to you and that such violation was a cause of injury to another, you will find that such violation was negligence unless such party proves by a preponderance of the evidence that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law. In order to sustain such burden of proof, such party must prove by a preponderance of the evidence that he was faced with circumstances which prevented compliance or justified noncompliance with the statute or regulation."

Obviously, there is disagreement between the medical experts and you have got to determine, basically, which side is correct. And so anyway, these are the statutory and regulatory provisions."

The court then read the jury provisions from Health and Safety Code, sections 24172 and 24173, and from 21 Code of Federal Regulations, sections 50.3, 50.20, 50.27, and 812.100 (1996). The Daums contend it was error to refuse their request to instruct the jury on negligence per se. ■ "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].) ■ The Daums correctly note that nothing bars application of the negligence per se doctrine in medical negligence actions. (See, e.g., *Landeros* v. *Flood* (1976) 17 Cal.3d 399, 413-414 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324] [malpractice based on physician's and hospital's failure to comply with statutory child abuse reporting requirements; reversing dismissal after demurrers]; *Evraets* v. *Intermedics Intraocular, Inc.* (1994) 29 Cal.App.4th 779, 791-793 [34 Cal.Rptr.2d 852] [negligence per se claim against manufacturer of ocular lens implanted during investigational study, alleging failure to comply with informed consent requirements of federal regulations; reversing dismissal after demurrers]; *Derrick* v. *Ontario Community Hospital* (1975) 47 Cal.App.3d 145, 151 [120 Cal.Rptr. 566] [negligence based on hospital's failure to comply with statutory contagious disease reporting requirements; reversing dismissal after demurrer]; see also *DiRosa* v. *Showa Denko K.K.*, *supra*, 44 Cal.App.4th 799, 805-809 [no error in negligence per se instructions based on federal regulations governing adulterated food and drugs; affirming judgment for plaintiff who suffered illness after taking L-Tryptophan capsules].)

The Daums argue they presented sufficient evidence on each of the four elements of negligence per se to entitle them to an instruction. We first consider the third and fourth elements, on which the court must find in the plaintiff's favor as a prerequisite to charging the jury with BAJI No. 3.45.

*Injury resulting from the kind of occurrence the statute or regulation was designed to prevent:* Health and Safety Code section 24170 et seq., the Protection of Human Subjects in Medical Experimentation Act, was based on a legislative finding of a growing need to protect citizens from unauthorized medical experiments. This legislation, enacted in 1978, was intended "to provide minimum statutory protection for the citizens of this state with

regard to human experimentation and to provide penalties for those who violate such provisions." (Health & Saf. Code, § 24171, subd. (d).) Spine-Care contends the informed consent provisions of Health and Safety Code section 24173 were intended to protect patients from being involuntarily subjected to experiments, whereas the use of investigational devices is not an "experiment." However, Health and Safety Code section 24174 defines "medical experiment" to include "the investigational use of a drug or device as provided in Sections 26678 and 26679." Health and Safety Code section 26678 referred to investigations conducted under the requirements of 21 United States Code former sections 505(i) and 520(g) of the federal Food, Drug, and Cosmetic Act, and related federal regulations.[8] Health and Safety Code section 26679 referred to investigational use of devices by experts under specified conditions. SpineCare's clinical investigation of the Wiltse II device was conducted under the regulations found in 21 Code of Federal Regulations, part 50, among other applicable requirements. These regulations apply "to all clinical investigations regulated by the Food and Drug Administration under sections 505(i) . . . and 520(g) of the Federal Food, Drug, and Cosmetic Act." (21 C.F.R. § 50.1(a) (1996).) They are "intended to protect the rights and safety of subjects involved in investigations filed with the Food and Drug Administration . . . ." (*Ibid.*)

Health and Safety Code section 24173 states: " 'informed consent' means the authorization . . . to have a medical experiment performed after each of the following conditions have been satisfied." Among the prescribed conditions is a signed and dated written consent form, and both verbal and written information regarding the nature and purpose of the "experiment." The subject is entitled to a copy of the consent form, and his or her consent must be voluntarily and freely given, without any element of deceit, duress, or undue influence. (Health & Saf. Code, §§ 24172, subd. (i), and 24173, subds. (a), (b), & (c).) 21 Code of Federal Regulations, section 50.20 (1996) requires that before a person becomes a subject in a clinical investigation, his or her "legally effective informed consent" must be obtained under circumstances "that provide . . . sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence." The federal regulations require the subject to be informed the study involves research, and to be told which procedures are experimental. (21 C.F.R. § 50.25(a)(1) (1996).)[9] They also require the subject to be given a copy of the written consent form. (21 C.F.R. § 50.27(a) (1996).) Clearly,

---

[8] Health and Safety Code sections 26678 and 26679 were recodified in 1995 at Health and Safety Code sections 111590 and 111595. References to "the federal act" in these statutes are to the federal Food, Drug, and Cosmetic Act. (Health & Saf. Code, §§ 26011, 109930.)

[9] The trial court did not read 21 Code of Federal Regulations section 50.25 (1996) to the jury, but the Daums requested that it be given as a jury instruction.

both California's Protection of Human Subjects in Medical Experimentation Act and the federal regulations in 21 Code of Federal Regulations, part 50 were intended to prevent patients from becoming unwitting subjects in investigational trials conducted under FDA regulations.

SpineCare argues that Health and Safety Code section 24173 does not prescribe the physician's duty to provide informed consent. It contends the statutory requirements do not differ in any significant respect from the common law informed consent standards established by *Cobbs*. We disagree. By requiring the patient to consent in writing to participate in an experimental or investigational procedure, and to be given a copy of the written consent, the statute makes significant specific procedural additions to the general common law requirements. (Cf. *Traxler* v. *Varady* (1993) 12 Cal.App.4th 1321, 1331 [16 Cal.Rptr.2d 297] [statute generally requiring patients to receive as much information as they need to give informed consent does not add anything to common law requirements].) SpineCare does not contend on appeal that the federal regulations do not affect the standard of care regarding informed consent. At trial, however, SpineCare strongly argued that the FDA does not establish the standard of care. We need not consider whether this is true as a general proposition, because SpineCare specifically agreed to comply with FDA regulations as a condition for conducting the investigational study of the Wiltse II in which Mr. Daum participated. Having so agreed, SpineCare may not claim it is not bound by the regulations.

Mr. Daum presented sufficient evidence that his injury resulted from the kind of occurrence the statutes and regulations discussed above were intended to prevent—participation in a clinical trial without the subject's fully informed consent in writing, with a copy for the subject and under circumstances permitting a free and deliberate choice.

*Plaintiff within the class of persons for whose protection the laws were enacted*: This requirement was met. Mr. Daum's surgery was conducted as part of SpineCare's clinical investigation of the Wiltse II device. As discussed above, patients in clinical investigations are the intended beneficiaries of the statutes and regulations at issue.

■ We consider next whether the Daums presented substantial evidence supporting the first two elements of the negligence per se doctrine, which were questions for the jury to determine.

*Statutory and regulatory violations*: SpineCare concedes one violation, the failure to give Mr. Daum a copy of the Wiltse II consent form. SpineCare

argues this was the only violation asserted by the Daums at trial. In response, the Daums cite their opening statement and closing argument. The record supports the Daums' assertion of the following violations: (1) failure to inform Mr. Daum both verbally and in writing of the investigational nature of the Wiltse II (Health & Saf. Code, § 24173, subd. (c); 21 C.F.R. §§ 50.25(a)(1), 50.27(a) (1996)); (2) failure to give Mr. Daum a copy of the consent form (Health & Saf. Code, § 24172, subd. (i); Health & Saf. Code, § 24173, subd. (a); 21 C.F.R. § 50.27(a) (1996)); and (3) failure to obtain Mr. Daum's consent to participate in the Wiltse II clinical trial under circumstances giving him sufficient opportunity to consider the decision, and without any element of deceit, coercion, or undue influence (Health & Saf. Code, § 24173, subds. (c) & (e); 21 C.F.R. § 50.20 (1996)).[10]

Mr. Daum testified he was never informed before the day of surgery that the Wiltse II was an experimental or investigational device. Experts on both

---

[10]At oral argument, SpineCare asserted the Daums' requested negligence per se instruction was premised solely on SpineCare's failure to give Mr. Daum a copy of the Wiltse II consent form. SpineCare contended this was made clear at an unreported conference on jury instructions in the trial court's chambers, and was inferable from the parties' arguments on the Daums' motion for a new trial. Nothing in the Daums' proposed instructions supports this argument, nor do the proceedings on the new trial motion. The Daums' counsel complained that he had premised his case on the applicability of the state statutes and federal regulations, only to discover at the conference on jury instructions that the court would refuse to instruct the jury that these laws applied. He claimed both in his moving papers and at argument on the motion that SpineCare had failed to provide timely and complete disclosure as required by the statutes and regulations, not merely that it had failed to give his client a copy of the form. It was SpineCare's counsel, and the trial court, who concentrated on the failure to provide a copy and its impact on the causation issue. The Daums' counsel responded correctly that under the negligence per se doctrine, causation was an issue for the jury to determine.

SpineCare also contended for the first time at oral argument that the Daums' proposed negligence per se instruction was improper because it included copies of a number of irrelevant statutes and regulations. It is the plaintiff's duty to propose correct instructions; the trial court need not correct erroneous instructions, but may simply reject them. (*Hyatt* v. *Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335 [145 Cal.Rptr. 47].) However, the Daums' proposed instructions were not all incorrect, even though they did include an overbroad selection of statutes and regulations. BAJI No. 3.45 by its terms refers to statutes or regulations read to the jury. (See fn. 7, *ante*.) The Daums separately numbered the various statutes and regulations as individual proposed instructions, in compliance with California Rules of Court, rule 229(b). Some were clearly applicable and some were not, but the trial court was not free to reject these instructions entirely because some were inappropriate. The court could properly have required counsel to narrow his request to eliminate the marginally relevant material, but in fact the court did make its own selection of statutes and regulations to read to the jury, which included most of the relevant material. (See text following fn. 7, *ante*.)

We note the trial court did not preserve the record of the instructions proposed by the Daums. The statutes and regulations the court did choose to read were removed from the proposed instructions, and the headings identifying them as plaintiffs' proposed instructions were blacked out before they were given to the jury. By holding these instructions before a lamp, the original designations can be discerned; however, it would be better practice to give the jury redacted copies of the proposed instructions and keep the originals in the court's file.

sides agreed Mr. Daum could not be expected to remember signing the Wiltse II consent form shortly before surgery due to the memory-blocking effect of the anesthetic he was given. The sequence of events on the morning of surgery was such that Mr. Daum had less than a half hour to read and consider the seven-page consent form. As noted, it is conceded Mr. Daum never received a copy of the form. Dr. Rutberg, one of the Daums' experts, testified "[t]he intimidation of being in the hospital waiting for surgery is just too much for a proper consideration" of whether to sign a consent. Dr. Nagel, one of SpineCare's experts, acknowledged that patients are "somewhat vulnerable" on the morning of surgery, though he denied the situation amounted to undue influence over the decision on consent. We conclude the evidence of statutory and regulatory violations was substantial.

■ *Causation*: To establish causation in informed consent litigation, the plaintiff must show that a prudent person in the plaintiff's position would not have agreed to the procedure if he or she had been properly informed. (*Cobbs*, *supra*, 8 Cal.3d at p. 245; *Spann* v. *Irwin Memorial Blood Centers*, *supra*, 34 Cal.App.4th at p. 657; *Willard* v. *Hagemeister*, *supra*, 121 Cal.App.3d at p. 418.) Mr. Daum testified that if he had seen the Wiltse II consent form in advance, he would not have agreed to participate in a clinical trial; he would have opted for the fusion surgery Dr. Prolo had recommended. He had chosen the operation proposed by Dr. Goldthwaite over that proposed by Dr. Prolo because Dr. Goldthwaite promised a six-week recovery, as opposed to the six months Dr. Prolo said it would take to recover. However, Mr. Daum claimed he would have been unwilling to be the subject of an experiment with an unproved device. Mr. Daum designed training courses for IBM; he said he knew from this experience that "the first things that you will build always have some problems with them."

Mr. Daum's subjective and retrospective view on this point is not determinative, however. In *Cobbs*, the Supreme Court stated: "The patient-plaintiff may testify on this subject but the issue extends beyond his credibility. Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so, with the 20/20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment. Thus an objective test is preferable: i.e., what would a prudent person in the patient's position have decided if adequately informed of all significant perils. (*Canterbury* v. *Spence* [(D.C. Cir. 1972)] 464 F.2d 772, 791 [150 App.D.C. 263].)" (*Cobbs*, *supra*, 8 Cal.3d at p. 245.) In *Canterbury* v. *Spence* (D.C. Cir. 1972) 464 F.2d 772 [150 App.D.C. 263], the court added the following to its statement of the objective test adopted by

*Cobbs*: "If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings." (*Id.* at p. 791, fn. omitted.)

SpineCare contends the trial court correctly determined the causation issue when it denied the Daums' motions for judgment notwithstanding the verdict and for a new trial. In the trial court's view, the evidence established the following: (1) Mr. Daum had decided on implantation of the Wiltse II device prior to the operation; (2) the Wiltse II was not very different from other, approved spinal fixation devices which were associated with the same risks of infection as the Wiltse II; (3) Mr. Daum was adequately informed that implantation of any device could lead to infection; (4) it was "highly unlikely" that Mr. Daum would have decided to cancel the operation had he been given a copy of the Wiltse II consent form in advance.

The Daums respond there was no evidence Mr. Daum would have considered the implantation of any device had he known about the investigational status of the Wiltse II. Drs. White and Goldthwaite testified they would not have recommended the use of any implant other than the Wiltse II for Mr. Daum. The fusion operation recommended by Dr. Prolo did not involve a fixation device, which Dr. Prolo considered an advantage. SpineCare's experts acknowledged that fixation devices are associated with a higher risk of infection in spinal fusion surgery. Furthermore, no fixation device using pedicle screws was approved by the FDA, a fact Mr. Daum should have learned if given the opportunity to inquire into the Wiltse II's investigational status.

We conclude the Daums' evidence of causation was substantial enough to require a negligence per se instruction. Mr. Daum's claim to a conservative approach finds some support in his earlier decision to have a discectomy rather than fusion surgery following his car accident, and in the months he spent considering the fusion surgery described to him by Dr. Prolo. Mr. Daum's testimony that he would not have knowingly participated in a clinical trial, the undisclosed fact that no device using pedicle screws had been approved by the FDA, the absence of any evidence that a different fixation device would have been recommended for or acceptable to Mr. Daum, and the availability of an alternative procedure not requiring a fixation device were sufficient to raise a question for the jury regarding whether a prudent person in Mr. Daum's position would have declined the Wiltse II surgery.

All four elements of the negligence per se doctrine were sufficiently established in this case. The trial court erred in refusing the Daums' request for BAJI No. 3.45.

### 3. *Battery*

■ The trial court correctly refused the Daums' request for BAJI No. 6.10.5, which explains that the performance of an operation without the patient's consent is a battery. "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence." (*Cobbs, supra,* 8 Cal.3d at pp. 240-241; accord, *Freedman v. Superior Court* (1989) 214 Cal.App.3d 734, 739-740 [263 Cal.Rptr. 1] [patient induced to accept drug by deceptive statement regarding purpose of medication may bring action for negligence, but not for battery].)

Mr. Daum agreed to surgery using the Wiltse II implant, and that is what Dr. Goldthwaite performed. Any failure to disclose the investigational status of the device did not involve intentional deviation by Dr. Goldthwaite from the consent given by Mr. Daum. Therefore, under *Cobbs,* Dr. Goldthwaite can only be charged with negligence in failing to meet his duty of full disclosure.

### 4. *Prejudice*

■ To prevail on a claim of instructional error, the appellant must show a reasonable probability of a more favorable result in the absence of the error. This determination depends heavily on the particular nature of the error, and its effect on the appellant's ability to place his or her full case before the jury. Actual prejudice must be assessed in the context of the trial record; article VI, section 13 of the California Constitution requires us to examine "the entire cause, including the evidence" to determine whether the verdict was prejudicially affected. We evaluate instructional errors by considering (1) the state of the evidence, particularly conflicts on critical issues; (2) the effect of other instructions; (3) the effect of counsel's argument, particularly whether the respondent's arguments to the jury may have contributed to the misleading effect of the instructional error; (4) any indication by the jury that it was misled; and (5) the closeness of the verdict. These factors apply both to erroneous instructions, such as BAJI No. 6.30 in this case, and to the omission of required instructions, such as the negligence per

se instruction requested by the Daums. (*Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th at pp. 570-571, 580-581.)

 *The state of the evidence*: SpineCare contends the Daums are unable to show prejudice because the jury found that Mr. Daum was given "all relevant information" regarding his surgery. The experts on both sides were nearly unanimous in testifying the standard of care required Mr. Daum to be told before the day of surgery that the Wiltse II was an investigational device being used in a clinical trial.[11] Since the jury was instructed to consider only the expert testimony in determining whether SpineCare's disclosure met the legal standard of care, SpineCare contends the jury necessarily accepted Dr. Goldthwaite's testimony that he had orally informed Mr. Daum of the Wiltse II's investigational status before the day of surgery, and rejected Mr. Daum's testimony to the contrary. This argument, if supported by the record, would be fatal to the Daums' position. If Mr. Daum went forward with the surgery even though he knew it was part of a clinical trial of the Wiltse II, he cannot show the requisite causal connection between his injury and the failure to properly obtain his informed consent in writing. (See *Spann* v. *Irwin Memorial Blood Centers*, *supra*, 34 Cal.App.4th at pp. 657-658 [plaintiffs who actually knew of AIDS risk from blood transfusion failed to raise triable issue on whether reasonable person would have declined treatment if blood bank had made full disclosure].)

Considering all the expert testimony, however, we are not convinced the jury felt it had to resolve the conflict between Dr. Goldthwaite and Mr. Daum regarding oral disclosure. While the defense experts conceded Mr. Daum should have been told in advance about the status of the Wiltse II, they also insisted this was insignificant information. The defense experts, and the three SpineCare doctors, testified the Wiltse II was merely an improvement on existing pedicle screw fixation devices that had been used for years without FDA approval, and without giving patients the elaborate disclosures provided on the Wiltse II consent form. The witnesses who were surgeons involved in Wiltse II clinical trials all testified that none of their patients had ever declined the surgery just because the device was considered investigational by the FDA. The implicit significance of this testimony was that the Wiltse II's investigational status was not an important factor for patients to consider, and informing the patient that the surgery was part of a clinical trial was only a technical requirement imposed by the FDA. Therefore, when the jury considered the first question on the special verdict form, asking whether SpineCare had disclosed to Mr. Daum "all relevant information which would enable him to make an informed decision regarding the

---

[11]Only Dr. Nagel believed that it would be within the standard of care to inform Mr. Daum for the first time just before surgery that he was participating in a clinical trial of an investigational device.

proposed operation," it may well have decided that even though Mr. Daum should have been told he would be part of a clinical trial of the Wiltse II, this was not really "relevant information" under the standard of care established by the expert testimony.

The state of the evidence was such that the jury could reasonably have rejected Dr. Goldthwaite's claim that he orally informed Mr. Daum about the FDA status of the Wiltse II. Dr. Goldthwaite's testimony on this point was not corroborated by any documentary evidence or by Dr. Pletz, who was present at all of Mr. Daum's preoperative appointments at SpineCare. Dr. Goldthwaite's trial testimony about when he obtained Mr. Daum's informed consent for use of the Wiltse II conflicted with his deposition testimony. He did not have a specific memory of discussing the investigational status of the Wiltse II, or even of discussing the risks and benefits of the surgery. He testified that he "would expect" he had obtained Mr. Daum's informed consent at the November meetings. When pressed for details, Dr. Goldthwaite said he simply could not believe that he did not obtain a fully informed consent for such major surgery. However convincing such an explanation might be regarding the specific risks and benefits of the operation, it does not carry much weight regarding the investigational status of the Wiltse II, which Dr. Goldthwaite himself did not consider an important factor.[12]

Mr. Daum's claim that he was never told he was participating in a clinical trial of an investigational device found some circumstantial support in the testimony of a personnel officer from his employer, who said Mr. Daum's medical insurance did not cover experimental or investigational procedures. Mr. Daum testified he was familiar with his insurance benefits, and would have remembered hearing the words "experimental" or "investigational," because he knew he was not covered for such procedures. Nor did Mrs. Daum recall hearing that her husband was participating in a medical investigation.

It is reasonably probable that a properly instructed jury would have decided against SpineCare regarding whether Mr. Daum was actually informed of the Wiltse II's investigational status.

The second critical evidentiary showing in this case involved causation. Mr. Daum could not win unless he convinced the jury that a prudent person

---

[12]When asked by his counsel to describe the surgery the way he would have described it to Mr. Daum, Dr. Goldthwaite gave a lengthy recitation including many specific risks of the surgery, but only one passing reference to the FDA status of the Wiltse II: "And we have just become a second set in the second group of investigators for this system from the Wiltse system, so that we can participate in the study with the FDA to see if these things really work."

in his position would not have gone through with the surgery had he known he was participating in a clinical trial of an investigational device.[13] (*Cobbs, supra,* 8 Cal.3d at p. 245.) We have already reviewed the Daums' showing on causation in our negligence per se discussion, concluding it was sufficient to require an instruction on negligence per se. We must now compare that showing with the other evidence bearing on causation to determine whether the trial court's instructional error prejudicially affected the verdict. (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at p. 580.) The evidence against a finding of causation came from the testimony of SpineCare's experts, who insisted the investigational status of the Wiltse II was not a significant factor because of its similarity to other frequently used pedicle screw devices. As noted above, all SpineCare's witnesses who had been surgeons in clinical trials of the Wiltse II testified that no patient of theirs had ever refused the surgery just because the device was investigational, though some declined it for other reasons.

What would a prudent person in Mr. Daum's position have decided if fully informed he was going to be part of a clinical trial of the Wiltse II? A fully informed patient would know the Wiltse II was an improvement on earlier pedicle screw systems, and no fixation device using pedicle screws had been approved by the FDA, although such devices had been widely used by orthopedic surgeons. A person in Mr. Daum's position would have the option of fusion surgery without a fixation device, as suggested by Dr. Prolo.[14] This would require an immobilizing restraint following surgery and a longer recovery period than after the implantation of a fixation device, but would carry a lower risk of infection. Knowing about the investigational status of a fixation device might well magnify a prudent patient's general concerns about a spinal implant, such as the increased risk of infection with a fixation device, or even the very idea of having a piece of metal in one's body. The question is a close one, but considering the element of caution inherent in the "prudent person" standard, we believe there is a reasonable probability Mr. Daum could establish causation in a retrial.

■ *The effect of other instructions*: No other instructions tended to cure the errors in instructing the jury to consider only expert testimony on the standard of care, and in failing to instruct on negligence per se. Furthermore, the instructional errors compounded each other. Not only was expert testimony allowed to set the standard of care, but the jury was specifically told

---

[13]Because the jury found no breach of the duty of disclosure, it did not reach the second question on the special verdict form, which asked whether a prudent person in Mr. Daum's position would have consented to the operation if "adequately informed of all the significant perils attending such operation."

[14]In fact, Mr. Daum had decided on that surgery at one time, but was persuaded to accept a fixation device after he went to SpineCare.

not to apply the legal standards on which the Daums' case rested. SpineCare argues the court did read the relevant statutes and regulations to the jury, so they could be considered during deliberations. However, the court informed the jury it was not to rely on the statutes and regulations to determine SpineCare's duty of disclosure, but only to resolve conflicts in the expert testimony. If the statutes and regulations did not set the standard of care, it is difficult to understand how the jury could use them to determine the standard accepted by the medical community. The presentation to the jury of the law governing the physician's duty of disclosure was confusing as well as erroneous.

*The effect of counsel's argument:* SpineCare's counsel made full use of the instructional errors in his closing argument. He told the jurors they might be surprised at the trial court's instructions, and might disagree with them, but they were bound to follow the law as embodied in the instructions. He stressed that the standard of care governing informed consent was established by "what doctors do and what they find acceptable amongst their peers," and this standard could only be determined from the expert testimony. He insisted the standard of care was not set by FDA regulations, and criticized Dr. Jones, the Daums' expert, for suggesting otherwise. He noted the defense experts believed it was within the standard of care to have a consent form signed at the time of surgery, without noting that all but one of the experts at least implicitly conditioned this opinion on the supposition that full oral disclosure was provided earlier. (The Daums' counsel reminded the jury in his closing argument that the experts' opinions were based on the assumption that Dr. Goldthwaite had gone over the contents of the Wiltse II consent form orally with Mr. Daum.) SpineCare's counsel argued the written consent was merely paperwork, which was unimportant to the medical issues confronting doctor and patient.

*Indications the jury was misled:* The Daums contend declarations from two jurors indicate the jury was misled by the erroneous instructions. The first declaration states that in the original poll, the majority of jurors believed the informed consent obtained from Mr. Daum was inadequate, but after further deliberations the jury concluded it could not apply statutory or regulatory law, because "doctors are allowed to set their own standard of care." This juror believed a different result would have been reached if the statutes and regulations were applied. The other declaration states the statutes and regulations "were allowed to play no part in our decision," and a different verdict may have been reached if the jury were instructed to apply the statutes and regulations.

These declarations are inadmissible because they speculate on the jury's reasoning process during deliberations. (Evid. Code, § 1150; *Maxwell* v.

*Powers* (1994) 22 Cal.App.4th 1596, 1604-1605 [28 Cal.Rptr.2d 62].) In any event, they add nothing to our analysis. The logical effect of the erroneous instructions is clear from the trial record. Our conclusion regarding the likely result of a retrial is based on a review of the record under the guidelines established by the Supreme Court in *Soule* v. *General Motors Corp., supra,* 8 Cal.4th 548, not on the conjecture in the jurors' declarations.

*The closeness of the verdict:* The verdict was 11-1. However, we do not believe the strong majority finding Mr. Daum received adequate disclosure indicates any lack of prejudice to the Daums from the erroneous instructions. To the contrary, it seems likely the instructions made it easy for the jury to decide in SpineCare's favor based on an erroneous legal standard regarding the duty of disclosure to patients in clinical trials.

We conclude the Daums were prejudiced by the trial court's instructional errors. Instead of being able to try the case based on the statutes and regulations governing clinical trials, the Daums were forced to engage in a battle of experts over the duty of disclosure. The jury resolved this dispute based on erroneous instructions. Prejudice will generally be found when the jury's verdict was probably based on erroneous instruction. (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at p. 574, following *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946], and *Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].) We recognize the causation issue presents a close question. The jury did not reach that question because of the instructional errors. The Daums deserve a chance to present their case to a jury that is properly instructed on SpineCare's duty of disclosure.

B. *The Nonsuit in Dr. Pletz's Favor*

 The trial court granted Dr. Pletz's motion for nonsuit after the Daums finished presenting their evidence. The Daums contend this was error, because Dr. Pletz was jointly responsible with Dr. Goldthwaite for managing Mr. Daum's treatment at SpineCare.

 In reviewing a judgment of nonsuit, we must give the plaintiff's evidence all the value to which it is legally entitled, drawing every legitimate inference from that evidence and disregarding conflicting evidence. However, the plaintiff must produce evidence supporting at least a logical inference of liability, not merely speculation or conjecture. If there is no substantial evidence of liability, we must affirm the grant of a nonsuit. (*Townsend* v. *Turk* (1990) 218 Cal.App.3d 278, 280, fn. 1 [266 Cal.Rptr. 821]; *Mahannah* v. *Hirsch* (1987) 191 Cal.App.3d 1520, 1525-1526 [237 Cal.Rptr. 140].)

The Daums presented no evidence that Dr. Pletz owed Mr. Daum a duty to inform him the Wiltse II was an investigational device being used by SpineCare as part of a clinical trial. Dr. Pletz was not a designated investigator in the trial, as was Dr. Goldthwaite. The statutes and federal regulations on which the Daums rely to establish the duty of disclosure clearly hold "the investigator" (21 C.F.R. § 50.20 (1996)) or the "person who is primarily responsible for the conduct of a medical experiment" (Health & Saf. Code, § 24176) responsible for obtaining the subject's informed consent. As an internist, Dr. Pletz's responsibilities involved the nonsurgical aspects of Mr. Daum's treatment. Dr. Pletz had never been responsible for obtaining a patient's informed consent to a Wiltse II implant, either before or after Mr. Daum came to SpineCare for treatment.

The Daums note that Dr. Pletz admitted discussing some general risks of surgery with Mr. Daum, both at the November 2 meeting with Dr. Goldthwaite present and at the November 14 meeting when Dr. Goldthwaite may or may not have been present. The Daums also emphasize that Dr. Pletz and Dr. Goldthwaite both testified they were jointly responsible for Mr. Daum's treatment at SpineCare. However, this evidence does not support a logical inference that Dr. Pletz shared Dr. Goldthwaite's duty to disclose the FDA status of the Wiltse II. While Dr. Pletz acknowledged discussing general risks of surgery with Mr. Daum, he also testified it was not his responsibility to obtain Mr. Daum's written consent to accept those risks. The surgical consent forms Mr. Daum signed on November 14 were signed by Dr. Goldthwaite, not Dr. Pletz. The Daums' counsel, in questioning both doctors as hostile witnesses under Evidence Code section 776, presumed it was Dr. Goldthwaite's responsibility to disclose the FDA status of the Wiltse II, and that any duty on Dr. Pletz's part was merely to convey information from Dr. Goldthwaite to Mr. Daum. The trial court properly granted Dr. Pletz's motion for nonsuit.

## III. Disposition

The judgment of nonsuit is affirmed, but the judgment is otherwise reversed. The Daums shall recover their costs on appeal.

Corrigan, Acting P. J., and Walker, J., concurred.

Respondents' petition for review by the Supreme Court was denied June 11, 1997.