[No. B125543. Second Dist., Div. Four. May 15, 2001.]

NATHANIEL GALVEZ, a Minor, etc., Plaintiff and Appellant, v. MICHAEL FRIELDS, Defendant and Respondent

1412

## Counsel

Jacobs, Jacobs & Rosenberg, Stanley K. Jacobs; and Marian H. Tully for Plaintiff and Appellant.

O'Flaherty, Cross, Martinez & Ovando and John J. Weber for Defendant and Respondent.

## OPINION

### VOGEL (C. S.), P. J.—

#### INTRODUCTION

This is a medical malpractice case in which Nathaniel Galvez sues defendant Michael Frields, M.D., for wrongful life, contending that Frields failed to make reasonable efforts to ensure Nathaniel's mother, Michelle Sepulveda, was given a blood test to detect the presence of the neural tube defect from which Nathaniel suffers. Plaintiff filed this action against Frields and several other defendants.[1] Following a trial during which the trial court refused to give a jury instruction on negligence per se (BAJI No. 3.45), the jury found that Frields was not negligent in his care of Sepulveda. Nathaniel appeals and asserts as the sole claimed error the trial court's refusal to give the negligence per se instruction. We conclude that the court erred in refusing to give the proffered instruction. Such error was clearly prejudicial, and we therefore reverse and remand for a new trial.

#### FACTUAL AND PROCEDURAL BACKGROUND

■ "Since the only contention on appeal related to a jury instruction, '[i]n assessing an instruction's prejudicial impact, we cannot use the view of the evidence and inferences most favorable to the [prevailing party]. [Citations.] Instead, we must assume the jury might have believed [appellant's] evidence and, if properly instructed, might have decided in [appellant's] favor. [Citations.]' (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 773 [15 Cal.Rptr.2d 815].) Accordingly, we state the facts most favorably to the party appealing the instructional error alleged, in accordance with the customary rule of appellate review. (*Sills* v. *Los Angeles Transit Lines* (1953) 40 Cal.2d 630, 633 [255 P.2d 795].)" (*Logacz* v. *Limansky* (1999) 71 Cal.App.4th 1149, 1152, fn. 2 [84 Cal.Rptr.2d 257].)

*Alpha-fetoprotein Testing*

Title 17 of the California Code of Regulations, section 6527, enacted in April 1986 pursuant to former section 289.7 of the Health and Safety Code (now Health & Saf. Code, § 125070), requires clinicians who provide prenatal care to advise all pregnant women in their care of the availability of

---

[1]Plaintiff filed suit against other doctors as well as Mullikin Medical Center. The claims against all defendants except Frields and Mullikin were disposed of prior to the conclusion of trial. The jury could not reach a verdict as to Mullikin and the court declared a mistrial. Frields is thus the sole respondent.

the alpha-fetoprotein (AFP) test, which screens for neural tube defects in the fetus.[2] Section 6527 provides in relevant part as follows:

"(a) Clinicians shall provide or cause to be provided to all pregnant women in their care before the 140th day of gestation, or before the 126th day from conception, as estimated by medical history or clinical testing, information regarding the use and availability of prenatal screening for birth defects of the fetus. This information shall be in a format to be provided or approved by the Department and shall be given at the first prenatal visit and discussed with each pregnant woman.

"(b) The provisions of subsection (a) shall not apply if the pregnant woman has completed more than 140 days of gestation or 126 days post conception, as estimated by medical history or clinical testing, and this fact is entered in the medical record.

"(c) Clinicians shall cause to be provided to all pregnant women who, after being provided with the information pursuant to subsection (a), voluntarily request prenatal screening for birth defects of the fetus, the opportunity, the circumstances of which are to be documented in the medical record, to read and sign an informed consent document in a format provided or approved by the Department.

"(d) If the pregnant woman consents to testing, the clinician shall arrange for prenatal screening directly or by referral to another clinician by:

"(1) Fully and accurately completing all required specimen collection forms provided by the Department for this purpose;

"(2) Collecting or arranging for the collection of an initial specimen following state directions for collection provided;

"(3) As soon as possible, but within 24 hours of collection, place or cause to be placed all initial and repeat specimens in the channel of transmittal to the designated Expanded AFP prenatal birth defects screening laboratory. [¶] . . . [¶]

"(i) Recognizing the strict gestational and time limits wherein prenatal detection of birth defects of the fetus is feasible, **clinicians shall make**

---

[2] " 'Neural tube defects of the fetus' means any malformation of the fetus caused by failure of the developing spine and skull to properly close. Examples are spina bifida and anencephaly." (Cal. Code Regs., tit. 17, § 6521, subd. (a).)

Article 2 (§§ 6521 through 6532) of title 17 of the California Code of Regulations, regarding prenatal screening for birth defects, was enacted in April 1986 pursuant to former section 289.7 of the Health and Safety Code (now § 125070).

**every reasonable effort to schedule screening and differential diagnostic tests and procedures appropriately with respect to the gestational dates of the pregnant woman. . . ."** (Boldface added.)

George Cunningham, M.D., chief of the Genetic Disease Branch of the California Department of Health Services (which administers the statewide program to screen for birth defects), participated in drafting the laws and regulations governing AFP testing. He testified at trial that neural tube defects are "a serious and common birth defect so it's to the individual family's interest and also to the State's interest to identify these defects prenatally so that if the woman chooses to terminate the pregnancy she has an opportunity to do that." A large majority of women who are told of the existence of a fetal neural tube defect elect to terminate their pregnancies.

AFP testing, which must be done between 15 and 19 completed weeks of pregnancy (or stated otherwise, between the beginning of the 16th week and the 20th week), involves drawing blood from the pregnant woman into a test tube provided by the state. The process of drawing the blood is no different from any other type of test requiring that blood be drawn. The blood sample does not have to be prepared for shipment; it is placed in the packaging provided by the state with a prepaid mailing label. The sample can be refrigerated if it cannot be mailed promptly. The time requirements imposed by the regulation are not in order to get an accurate result, rather they allow for follow-up diagnostic testing to be done while termination of the pregnancy is still feasible. The test results have to get back to the doctor; if the test is positive, the woman has to make an appointment at a prenatal center; an ultrasound is done; if amniocentesis (testing of the amniotic fluid) is done it takes two weeks to grow the cells and do the chromosome studies to confirm or deny the presence of a defect.[3]

Cunningham said that the regulations require doctors to make reasonable efforts to make sure the woman is tested within the window. He acknowledged that there are different styles of practice, and that the Department of Health Services leaves the details as to how to do it up to individual practitioners. "[B]ut we expect they would make reasonable efforts if the woman says she wants to be tested to make sure some time in that period they got blood drawn."

Although Cunningham testified that "[t]he regulations do correspond to the standard of care" for obstetricians, the trial court made clear to counsel

---

[3]The AFP test is used for the purpose of *screening* for neural tube defects; it accurately detects neural tube defects 95 percent of the time. The presence or absence of a neural tube defect in the fetus is confirmed by diagnostic testing in the form of ultrasound and amniocentesis.

and the jury that Cunningham was not testifying as an expert witness as to the standard of care.

### Mullikin Medical Center's AFP Testing Procedures

Laboratory work for Mullikin's obstetrical patients was done at the laboratory in the same building as Frields's office. The laboratory was open during normal business hours on weekdays, and generally patients could have their blood samples drawn anytime the laboratory was open. Blood samples for the AFP test, however, were only drawn from 8:30 a.m. to 9:30 a.m. on weekdays, in order to allow for the sample to be placed in the mail for pick up at 10:00 a.m. It was the obstetrical staff's usual practice to write on the cover of the state-prepared AFP booklet given to patients at their first prenatal visit that blood was drawn for the AFP test only from 8:30 a.m. to 9:30 a.m. on weekdays. To have the AFP test performed, a patient would go to the obstetrics department and get an AFP form, take it to the laboratory during the designated time, and have her blood drawn.[4]

### Sepulveda's Prenatal Care and Nathaniel's Birth

Sepulveda learned she was pregnant in January 1994. Her first prenatal medical appointment was on February 8, 1994; she was seen by a prenatal counselor at Mullikin. The counselor weighed her, discussed pregnancy issues with her, and calculated that she was expected to give birth on October 3, 1994. The counselor gave Sepulveda the state-prepared booklet regarding the AFP test, and obtained from her signed consent to have the test performed. Sepulveda recalled talking to the counselor about a state test to determine if the baby was healthy, but she did not recall it being referred to by name. She did not read the booklet or the consent form she signed. She said that she was not told then or at any time what hours the AFP testing was done, or that the procedure was any different than with other blood tests. There was no evidence that the booklet given to Sepulveda had the laboratory hours for AFP testing written on it. A notation in Sepulveda's chart dated February 8, 1994, indicates that the window of time for her to have the AFP test performed was April 11 through May 17, 1994. On February 8, Sepulveda was given a laboratory requisition slip to have her blood drawn for a different test, and she had the blood drawn at that time. An appointment was scheduled for Sepulveda to be seen by Frields.

---

[4]This procedure was in contrast to that used for other laboratory work involving drawing blood samples. Ordinarily, the doctor would fill out a requisition slip or tell an assistant to do so during the office visit, the patient would be given the slip and would be directed to go down the hall to the laboratory to have the blood sample drawn.

Frields[5] saw Sepulveda on March 8, 1994. She was weighed and given a requisition slip to have a urinalysis performed and to have her blood drawn for laboratory tests. She took the requisition slip to the laboratory and had her blood drawn. Frields confirmed Sepulveda's due date.

At her next appointment on April 8, 1994, Sepulveda was weighed and had a urinalysis performed. Frields testified that he talked to her about having an ultrasound and her AFP test done in two weeks, based on the fact he noted in her chart: "Sono in 2 weeks and AFP in 2 weeks." An appointment was made for her to have the ultrasound done at the laboratory. He did not give her a laboratory requisition slip for the AFP test or instruct her to get one from the nursing staff.

The ultrasound was done on April 13, 1994, at 10:15 a.m., in the Mullikin laboratory. Sepulveda was then 15.2 weeks into her pregnancy, and was therefore within the AFP window. Sepulveda was not told she could or should have the AFP test done on that day, and it was not done.

When he ordered the ultrasound and when he reviewed the radiologist's report, Frields believed the April 13 ultrasound was capable of demonstrating the condition of the brain, spinal cord, and heart of the fetus. Frields's normal practice was to rely upon the radiologist's report and not review the ultrasound film. At deposition, he said he was confident that the ultrasound adequately performed a fetal organ survey and ruled out the degree of neural tube defect that was present in this fetus. He interpreted the radiologist's note that "[n]o fetal pathology is identified" to mean that the radiologist could see the spinal cord. The radiologist's report did not contain the notation made on the ultrasound technician's worksheet to "[f]ollow up to see fetal spine and organs." Had that notation been included in the radiologist's report, Frields would have interpreted it to mean that the anatomical survey of Sepulveda's fetus was incomplete, and he would have ordered another ultrasound. The defense's expert physician testified that a level one sonogram, which Sepulveda had undergone, could not be relied upon to rule out a neural tube defect of the kind involved here.

Sepulveda was again seen by Frields on May 6, 1994, about 10:30 a.m. Frields knew there were only 11 days left to do the AFP test, and presumed Sepulveda wanted the test done. He knew her next appointment would be in June and the window of opportunity for performing the AFP test would be closed. He did not instruct anyone to make sure Sepulveda had the AFP test done. Sepulveda said that no one mentioned the AFP test to her that day.

[5]Frields provided obstetrical and gynecological services to Mullikin on a part-time basis, normally on Tuesday afternoons and Friday mornings from 9:30 until 12:00. He testified that he might have occasionally seen patients on Friday mornings as early as 8:30 or 8:45.

Sepulveda's next appointment was on June 3, 1994. Frields was aware that she had not had the AFP test done. He did not discuss with her doing any alternative tests, such as another ultrasound or amniocentesis, and he did not order either test while Sepulveda was in her second trimester and termination of the pregnancy was still feasible. An obstetrical nurse at Mullikin testified that Sepulveda acknowledged that she had missed having the AFP test done due to personal problems. Sepulveda denied making that statement, having personal problems that would prevent the test being done, or otherwise discussing the test or the fact that she had missed it with anyone at Mullikin. She was unaware that she had missed the AFP test; she assumed that she would be given a form to have the test done and that whatever tests she needed and had agreed to had in fact been done.

On September 25, 1994, Sepulveda went to the hospital thinking she was having contractions and her amniotic fluid was leaking. Frields performed an ultrasound to see if there was sufficient amniotic fluid and immediately realized that the baby had an enlarged head, indicating hydrocephalus. Sepulveda was sent home. Her water broke and she went into labor the next morning. She was told her baby had spina bifida, a large hole in his back, and very little brain tissue. It was not expected that he would survive. Nathaniel was delivered that evening.

Despite the concurrence of various health care professionals that Nathaniel would not survive, and although Sepulveda followed their advice regarding performing or refraining from performing various medical procedures because he was expected to die, Nathaniel survived. He is profoundly disabled; he is paralyzed, although he has use of his left hand, he exhibits no purposeful movement, he is cortically blind, and he cannot speak or perform any basic function for himself.

Although the defense introduced evidence that Sepulveda is Catholic and that she would not have chosen to terminate the pregnancy, she testified unequivocally that had she known the fetus had a neural tube defect she would have terminated the pregnancy.

Sepulveda was originally named as a plaintiff in this lawsuit, in addition to being named guardian ad litem for Nathaniel, but after trial began the parties stipulated to dismiss Sepulveda as an individual plaintiff. The trial proceeded against Mullikin and Frields with Nathaniel as the only plaintiff.

The trial court refused to give Nathaniel's requested jury instruction based on BAJI No. 3.45 regarding negligence per se, which stated: "If you find that a party to this action violated Section 6527 of Title 17, of the California

Code of Regulations, the regulation set forth in Exhibit Number 16 and that such violation was a cause of injury to another, you will find that such violation was negligence unless such party proves by a preponderance of the evidence that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law. In order to sustain such burden of proof, such party must prove by a preponderance of the evidence that he was faced with circumstances which prevented compliance or justified noncompliance with the regulation."[6]

The trial court stated: "Well, what's troubling me about this instruction is not only in this case but in other cases when negligence that's alleged is sought to be established as negligence per se. If that is the crux of the matter, then all you need is a statute and you don't need anything else. All you need is a statute." The court then ruled: "This instruction will be disallowed. I think it's confusing to the jury, unnecessary. There's ample oral evidence about the subject matter that you can argue, if you wish, but I'm not going to confuse the jury with telling them if the plaintiff fits into this statute, the ball game's over. I'm not going to give such an instruction."

After the case was submitted to the jury for deliberation, the jury hung as to Mullikin, and the court declared a mistrial as to it. The jury then found Frields was not negligent by a vote of nine to three. Judgment in favor of Frields was entered.

This appeal followed..

Discussion

## I. *Wrongful Life*

 California recognizes an impaired child's right to recover damages for "wrongful life." (*Turpin v. Sortini* (1982) 31 Cal.3d 220 [182 Cal.Rptr. 337, 643 P.2d 954].) The essence of a wrongful life action is that "if defendants had performed their jobs properly, [plaintiff] . . . would not have been born at all." (*Id.* at p. 231.) In such a case, an impaired child may recover special damages for the extraordinary expenses necessary to treat the

---

[6]Defense counsel objected to the instruction on the grounds that (1) Nathaniel's expert physician, William A. Frumovitz, testified that he had never read the statute "so the standard of care is certainly not dependent on this statute and this is a standard of care case"; and (2) the class of persons that are to be protected by this statute does not include the child, Nathaniel, but rather the taxpayers of California. Counsel for Frields pointed out to the trial court that the negligence per se instruction conflicts with BAJI No. 6.30, which tells the jury it must determine the standard of care from the opinions of the physicians.

hereditary ailment from which he or she suffers. (*Id.* at p. 239.) Wrongful life is basically one form of a medical malpractice action. (*Id.* at p. 229.)

"As in ordinary medical malpractice cases, the plaintiffs in a wrongful life and wrongful birth case must establish the following basic elements: '(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.' (*Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433]; *Turpin* v. *Sortini, supra,* 31 Cal.3d at pp. 229-230.)" (*Simmons* v. *West Covina Medical Clinic* (1989) 212 Cal.App.3d 696, 701-702 [260 Cal.Rptr. 772].)

## II. *Instructional Error Occurred*

 Nathaniel contends the court erred in refusing to instruct the jury regarding negligence per se, using BAJI No. 3.45, which would have permitted the jury to find that an unreasonable failure to abide by the requirements of California Code of Regulations, title 17, section 6527, constituted negligence. The negligence per se doctrine is codified in Evidence Code section 669, under which negligence is presumed if the plaintiff establishes four elements: (1) the defendant violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence of the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted. The first two elements are normally questions for the trier of fact, while the latter two elements are determined by the trial court as a matter of law. (*Daum* v. *SpineCare Medical Group, Inc.* (1997) 52 Cal.App.4th 1285, 1306 [61 Cal.Rptr.2d 260].)

 " 'Parties have the "right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court." [Citation.] "A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. [Citation.]" [Citation.]' (*Maxwell* v. *Powers* (1994) 22 Cal.App.4th 1596, 1607 [28 Cal.Rptr.2d 62].)" (*Logacz* v. *Limansky, supra,* 71 Cal.App.4th 1149, 1157.)

Frields contends that Nathaniel was not entitled to an instruction regarding negligence per se because he did not meet the third and fourth elements of the Evidence Code section 669 test; i.e., his injury did not result from an occurrence that the regulation was designed to prevent and he is not a member of the class of persons for whose protection the regulation was adopted.[7] At trial, Frields concurred in Mullikin's contention that the protected class of persons is taxpayers who have to pay for the care of children born with neural tube defects,[8] while on appeal he contends the protected class of persons is pregnant women. We reject this contention.

The essence of a wrongful life cause of action is that recovery is required where the defendant's negligence is the proximate cause of the child's need for extraordinary medical care and training. The ultimate concern is that the child exists and is entitled to legal recourse and compensation for such negligence. (*Gami v. Mullikin Medical Center* (1993) 18 Cal.App.4th 870, 881 [22 Cal.Rptr.2d 819], citing *Turpin v. Sortini, supra,* 31 Cal.3d at p. 238.)

In *Gami*, defendants negligently failed to inform a pregnant woman of the need for her to provide a second blood sample for AFP testing after the first blood sample she provided proved unsuitable for testing. "As a result of this negligence, [plaintiff's] mother did not have the opportunity to learn that [plaintiff] could have been afflicted with a neural tube defect" and the child was born with spina bifida. The appellate court held that the child was entitled to legal protection from the negligence of the health care providers, and could bring a wrongful life cause of action. (*Gami v. Mullikin Medical Center, supra,* 18 Cal.App.4th at p. 883.) In so doing, the court rejected the defendants' contention that if anyone had suffered injury, it was the pregnant woman and not the child, because as a result of the alleged negligence, the mother did not have the opportunity to learn that the child was afflicted with a neural tube defect and was thereby deprived of the opportunity to have an abortion. According to defendants, only the mother had standing to seek damages based on the deprivation of her right to an abortion.[9] The court rejected that notion, and so do we.

The regulations were, in fact, designed to prevent the birth of children with neural tube defects. By its very nature, genetic counseling is employed

---

[7]Frields does not argue that there was not substantial evidence presented to satisfy the first and second elements of the test: (1) the defendant violated a regulation; and (2) the violation proximately caused death or injury. Clearly, substantial evidence was presented based on which the jury could have made those findings.

[8]Inherent in that contention is the notion that the injury the regulation is designed to prevent is the birth of children with neural tube defects, for whose care the taxpayers have to foot the bill.

[9]The mother's cause of action for wrongful birth was dismissed on statute of limitations grounds.

at least in part so that a mother may make an informed decision on whether to abort a genetically defective fetus. Cunningham, who took part in drafting the regulations at issue, stated that it was beneficial to everyone involved, including the taxpayers of this state, that neural tube defects be identified *prenatally*. The time constraints imposed by the regulation exist in order to allow for consideration of abortion while it is still feasible for the mother to make the choice to terminate the pregnancy during the second trimester. Subdivision (i) of California Code of Regulations, title 17, section 6527 states: "Recognizing the strict gestational and time limits wherein prenatal detection of birth defects of the fetus is feasible, clinicians shall make every reasonable effort to schedule screening and differential diagnostic tests and procedures appropriately with respect to the gestational dates of the pregnant woman." It is undeniable that the regulations at issue were designed to give women like Sepulveda the option of avoiding the birth of a severely disabled child; to argue otherwise is simply disingenuous.

Frields argues that the trial court was justified in refusing the requested instruction because (1) it did not set forth the regulation but rather referred the jury to a copy of the regulation, exhibit 16, which was admitted in evidence; (2) the instruction was incomplete without inclusion of California Code of Regulations, title 17, section 6521, which contains definitions such as for the term "clinician"; and (3) it referred to "injury to another" and this could have confused the jury, since the relevant question was whether the violation caused injury to Nathaniel, not some other person such as Sepulveda. These arguments are simply specious. The trial court refused the instruction because of its hostility toward the doctrine of negligence per se, not because of any perceived shortcomings in the instruction. The first and second contentions, that the regulation was not set forth in the instruction and definitions were not provided, easily could have been remedied had the court permitted the instruction to be given. " ' "The imperfections were on a par with clerical errors that are easily corrected. Such trivial inaccuracies do not justify the refusal of an instruction where the result would be to leave the jury inadequately instructed on a material issue in the case. The instruction should have been corrected by the . . . court and given." ' . . ." (*Logacz v. Limansky, supra,* 71 Cal.App.4th at p. 1159, citation omitted.) The third contention, that reference to "injury to another" would confuse the jury into thinking it could base an award to Nathaniel on injury to Sepulveda or someone else, is unfounded. The jury was instructed regarding the elements of a cause of action for wrongful life, causation, and damages, and would not have had difficulty in understanding the basis for determining liability and damages in this case. The proposed instruction was not confusing and if any definitions were required Frields could have requested supplemental instructions.

III. *The Instructional Error Was Prejudicial*

We conclude that the trial court erred in refusing to instruct the jury regarding negligence per se based on the regulation set forth in section 6527.[10] "That is not to say, however, that a failure properly to instruct a jury is necessarily or inherently prejudicial. ▮ There is no automatic reversal merely because a trial court has failed to properly instruct a jury. (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) 'A judgment may not be reversed for instructional error in a civil case "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)' (*Ibid.*) [¶] Instructional error in a civil case is prejudicial ' "[w]here it seems probable" ' that the error prejudicially affected the verdict. (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946].) It is not enough that there may have been a 'mere possibility' of prejudice. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].) As the *Soule* court put it, the determination of prejudice depends heavily on 'the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury. . . .' " (*Logacz* v. *Limansky, supra,* 71 Cal.App.4th 1149, 1156.)

▮ It is clear from our review of the entire record that Nathaniel was not able to place his full case before the jury. As Frields correctly points out in his respondent's brief, the regulations at issue establish a standard of care. (*California Service Station, etc. Assn.* v. *American Home Assurance Co.* (1998) 62 Cal.App.4th 1166, 1177-1178 [73 Cal.Rptr.2d 182].) If properly instructed, the jury would have had the opportunity to find that Frields breached the applicable standard of care by violating the regulation. The evidence would have supported such a finding, but as we next explain, this jury was precluded from reaching that finding.

A finding of medical negligence must be based on a finding that a physician breached a standard of care. The regulations at issue here properly established a standard of care, but the jury was not given the negligence per se instruction which would have permitted them to rely on the regulations for that purpose. The only evidence they were given as to the standard of care came from the expert witnesses. Defense counsel and the trial court

---

[10]We note that the trial court did not reject the negligence per se instruction based on a finding that Nathaniel was not within the class of persons protected by the regulation, but rather due to the court's hostility toward the doctrine of negligence per se. But the doctrine being a valid one, the court erred in refusing to give the instruction where it was applicable to the facts presented by Nathaniel.

were adamant that Cunningham's testimony regarding the AFP regulations did not go to the issue of standard of care. Frumovitz, Nathaniel's expert witness on the standard of care, had never read the regulations. (See fn. 6, *ante.*) So even though, as Frields points out, the AFP regulations were discussed at length, it was made clear to the jury that they could not rely on the regulations to define the standard of care. Indeed, they were instructed using BAJI No. 6.30,[11] which told them that to determine the standard of care, they could rely *only* on the opinions of expert witnesses. Frields's trial counsel pointed out the conflict between the two instructions as a means of arguing against the use of BAJI No. 3.45. The refusal to give the negligence per se instruction was irrefutably prejudicial to Nathaniel's presentation of his case.

In *Daum v. SpineCare Medical Group, Inc., supra,* 52 Cal.App.4th 1285, the court concluded that where the trial court erroneously refused to instruct the jury regarding negligence per se, the use of BAJI No. 6.30 compounded the error and was inappropriate. "[T]he instructional errors compounded each other. Not only was expert testimony allowed to set the standard of care, but the jury was specifically told not to apply the legal standards on which the [plaintiffs'] case rested. [The defendant] argues the court did read the relevant statutes and regulations to the jury, so they could be considered during deliberations. However, the court informed the jury it was not to rely on the statutes and regulations to determine [the defendant's] duty . . . , but only to resolve conflicts in the expert testimony. If the statutes and regulations did not set the standard of care, it is difficult to understand how the jury could use them to determine the standard accepted by the medical community. The presentation to the jury of the law governing the physician's duty . . . was confusing as well as erroneous." (52 Cal.App.4th at pp. 1316-1317.)

The jury here was obviously confused, as evidenced by its inability to reach a verdict as to Mullikin, and was precluded from basing its ruling on Nathaniel's valid theory that the AFP regulations established a standard of care which Frields breached. Reversal is required.

### DISPOSITION

The judgment is reversed and the matter is remanded for a new trial on all issues. On remand, this case shall be assigned to a different trial judge.

[11]BAJI No. 6.30, as given to this jury, states: "You must determine the standard of professional learning, skill and care required of the defendant only from the opinions of the physicians including the defendant who have testified as expert witnesses as to such standard. [¶] . . . [¶] You must resolve any conflict in the testimony of the witnesses by weighing each of the opinions expressed against the others, taking into consideration the reasons given for the opinion, the facts relied upon by the witness, and the relative credibility, special knowledge, skill, experience, training and education of the witness."

(Code Civ. Proc., § 170.1, subd. (c).) Plaintiff shall recover his costs on appeal.

Hastings, J., and Curry, J., concurred.

A petition for a rehearing was denied June 8, 2001, and respondent's petition for review by the Supreme Court was denied July 25, 2001. Brown, J., did not participate therein.