[No. E042080. Fourth Dist., Div. Two. Oct. 18, 2007.]

BRIANNA V. BARRAGAN, a Minor, etc., et al., Plaintiffs and Appellants,
v.
ROBERT LOPEZ, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

\*Pursuant to California Rules of Court, rules 8.1105(b), this opinion is certified for publication with the exception of part 4.

COUNSEL

Nathaniel J. Friedman for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson; Davis, Grass, Goldstein & Housouer, James G. Davis and Tom M. Allen for Defendant and Respondent.

OPINION

**GAUT, J.**—This action arises from plaintiffs being born prematurely, with cerebral palsy. Plaintiffs, through their guardian ad litem, filed a wrongful life lawsuit against Dr. Robert Lopez, their mother's obstetrician/gynecologist, claiming Dr. Lopez should have advised their mother that she had the right to abort her pregnancy.

Plaintiffs appeal summary judgment entered in favor of Dr. Lopez. Plaintiffs contend triable issues exist as to whether Dr. Lopez had a duty to advise mother of her right to an abortion, causation, and damages. Plaintiffs also assert the trial court erred in denying plaintiffs' requests for sanctions, and allowing a second independent medical examination (IME) of plaintiffs. In addition, plaintiffs request this court to order Judge Plotkin disqualified in the event plaintiffs prevail on appeal and the case is remanded to the trial court.

After reviewing the expert declarations and other evidence submitted in support of and in opposition to Dr. Lopez's summary judgment motion, we affirm, finding it is undisputed that Dr. Lopez did not owe plaintiffs' mother a duty to advise her of her right to an abortion. We further reject plaintiffs' other contentions as moot or lacking in merit.

## 1. Factual Background

The following facts are undisputed and are from the declarations of Dr. Gary D. Blake, Dr. Lopez's expert witness, and Dr. John Williams III, plaintiffs' expert.

On December 22, 2000, when mother was approximately 11 weeks pregnant with plaintiffs (twins), mother first saw Dr. Lopez. Plaintiffs were growing appropriately. At the time of mother's subsequent visits to Dr. Lopez on January 10, 2001, and February 8, 2001, her pregnancy was progressing normally and she had no complaints or complications. On February 19, 2001, mother received an alpha-fetoprotein (AFP) test, "which screens for neural

tube defects in the fetus." (*Galvez v. Frields* (2001) 88 Cal.App.4th 1410, 1414 [107 Cal.Rptr.2d 50] (*Galvez*).) The AFP test results were negative for congenital defects.

On February 27, 2001, mother was seen at Pomona Valley Hospital Medical Center (PV Hospital) for a vaginal discharge, which contained blood that may have been from a scratch. The fetal heart rates were monitored and found to be within normal limits. Mother was discharged. The following day Dr. Lopez saw mother. During a vaginal examination he found her cervix closed with no evidence of vaginal bleeding, discharge or ruptured membranes. Dr. Lopez instructed mother to stay off work for two to four weeks, rest as much as possible, and abstain from sex and other strenuous activities. Mother was 20 weeks four days pregnant. Her vital signs were "within normal limits and both fetuses were found to be growing concordantly with positive fetal heart rates." Dr. Lopez referred mother to a perinatologist for an " 'interval growth' evaluation."

Dr. Lopez saw mother two weeks later, on March 14, 2001. She denied any complaints and her vital signs remained within normal limits. A sonogram confirmed concordant growth and positive fetal heart rates.

On March 26, 2001, perinatologist Dr. Curran evaluated mother. Perinatology, according to Dr. Blake, is a branch of medicine that focuses on fetal well-being during pregnancy. According to plaintiffs' expert, Dr. Williams, perinatology also includes care and treatment of high-risk pregnancies. Dr. Curran performed a more comprehensive sonogram examination, which "confirmed adequate placental implantation, normal amniotic fluid volumes and appropriate fetal growth." Plaintiffs' estimated gestational age was 24 weeks two days. Dr. Curran determined that one plaintiff weighed 677 grams and the other weighed 735 grams.

According to Dr. Blake, "A fetus is considered to be viable when gestational age reaches 24 weeks and/or when fetal weight exceeds 500 grams. Therefore, as of March 26, 2001, both fetuses were now viable and growing appropriately without any evidence of fetal anomaly. Up until this time, Ms. Munguia's pregnancy progressed normally without complaints (other than the 'questionable discharge') and without any evidence of pre-term labor, spontaneous rupture of membranes, bleeding or infection."

The next day, mother called Dr. Lopez and told him she was leaking fluid. Dr. Lopez told her to go immediately to the hospital. It was determined at the

hospital that one of the amniotic sacs had spontaneously ruptured. Mother was admitted to PV Hospital for bed rest. A perinatologist confirmed by sonogram that, despite rupture of membranes, the amniotic fluid levels were normal. Plaintiffs' estimated gestational age was 24 weeks three days.

Mother remained in the hospital for strict bed rest, for three and a half weeks, up until April 21, 2001. During this time, there was no evidence of infection, abnormally low amniotic fluid levels, pregnancy-induced hypertension or fetal distress. On April 21, mother left the hospital, against medical advice. Within a couple of hours the police requested paramedic personnel to escort her back. Mother agreed to be readmitted for strict bed rest.

On April 30, 2001, mother began having contractions, which continued until Dr. Lopez performed a cesarean section delivery of plaintiffs. Their estimated gestational age was 29 weeks three days. An average full-term infant is 40 weeks (*Keeler v. Superior Court* (1970) 2 Cal.3d 619, 624, fn. 1 [87 Cal.Rptr. 481, 470 P.2d 617], superseded by statute on another ground as stated in *Wilson v. Kaiser Foundation Hospitals* (1983) 141 Cal.App.3d 891, 897, fn. 6 [190 Cal.Rptr. 649]; *In re Tartar* (1959) 52 Cal.2d 250, 257 [339 P.2d 553]). According to Dr. Blake, plaintiffs "developed significant complications most likely secondary to their premature delivery." Plaintiffs were born with cerebral palsy.

## 2.   Procedural Background

Plaintiffs and mother filed a complaint against Dr. Lopez and PV Hospital (defendants). The first through fourth causes of action are by plaintiffs against defendants for professional negligence and wrongful life. The fifth cause of action is by mother against defendants for intentional infliction of emotional distress. Plaintiffs elected not to amend the fifth cause of action after the trial court sustained Dr. Lopez's demurrer with leave to amend. Mother and PV Hospital are not parties to this appeal.[1]

Dr. Lopez filed a motion for summary judgment, supported by the declaration of Dr. Blake. Dr. Lopez argued he did not owe mother a duty to advise her of the right to an abortion; failure to advise mother of the right to an

---

[1] On October 12, 2006, the trial court granted PV Hospital's motion for summary judgment and entered judgment against plaintiffs and their mother.

abortion did not constitute professional negligence; Dr. Lopez did not cause or contribute to any injury to plaintiffs. Plaintiffs filed opposition, supported by the declaration of Dr. Williams.

After hearing oral argument, the trial court granted Dr. Lopez's motion for summary judgment and denied plaintiffs' request for sanctions under Code of Civil Procedure section 437c, subdivision (j). The trial court found that it was undisputed that, before plaintiffs became viable fetuses, mother's pregnancy progressed "in a normal fashion without any evidence of a potential complication." During this period, there also was no evidence of any significant fetal anomaly or endangerment of mother's life by continuing the pregnancy. Therefore it was undisputed that Dr. Lopez did not owe mother a duty to advise her of the right to an abortion.

The court also found there was no causal link between Dr. Lopez's treatment of mother and plaintiffs' cerebral palsy condition. According to Dr. Williams, plaintiffs' prematurity was the apparent cause. The trial court's written findings further stated that Dr. Williams's declaration was based on a faulty foundation and there was an inadequate basis for his opinion.

### 3. Summary Judgment

Plaintiffs contend Dr. Williams's declaration raised a triable issue of fact defeating Dr. Lopez's motion for summary judgment. Plaintiffs claim Dr. Williams's declaration established that Dr. Lopez breached a duty to advise mother of her right to terminate her pregnancy under Health and Safety Code section 123462.[2]

### A. Standard of Review

The following principles govern appellate review of an order granting a motion for summary judgment or summary adjudication: "A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.] We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.] In the trial court, once a moving defendant

---

[2] Unless otherwise noted, all statutory references are to the Health and Safety Code.

has 'shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established,' the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff 'may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' " (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477 [110 Cal.Rptr.2d 370, 28 P.3d 116], citing Code Civ. Proc., § 437c, subd. (*o*)(2), and *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854–855 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).)

Because this case comes to us on Dr. Lopez's summary judgment motion, we strictly construe Dr. Lopez's evidence and liberally construe plaintiffs' evidence, resolving any doubts in plaintiffs' favor. (*Aguilar, supra*, 25 Cal.4th at p. 860.) We review the trial court's evidentiary rulings for abuse of discretion. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 [23 Cal.Rptr.3d 915].)

### B. *Issues Tendered by the Pleadings*

Plaintiffs alleged four causes of action against Dr. Lopez, consisting of two for professional negligence (one as to each plaintiff) and two for wrongful life (one as to each plaintiff).

Plaintiffs' causes of action are founded on their claim that Dr. Lopez failed to advise mother of her right to abort her pregnancy. Plaintiffs allege in their complaint that Dr. Lopez willfully and/or negligently examined and cared for mother and plaintiffs, while in utero, and thereafter, "did not offer JANET MUNGUIA her right to an abortion, given the likelihood of fetal defects and a higher risk of morbidity with twins, that [plaintiffs] became developmentally delayed and [have] been diagnosed with cerebral palsy." Plaintiffs further allege that but for Dr. Lopez's failure to offer mother "her statutory (Health & Saf. Code § 12346[2](b)) option of abortion, she would have exercised said right" and plaintiffs would not have been born.

It is undisputed that, other than not advising mother of her right to an abortion, Dr. Lopez provided medical services within the standard of care. Thus, plaintiffs' appeal is predicated solely on the theory that a triable issue existed as to whether Dr. Lopez breached a duty of care by failing to advise mother of the right to an abortion.

## C. *Dr. Lopez's Moving Papers Were Sufficient to Justify Judgment in His Favor*

Dr. Lopez's moving papers established that he did not owe mother a duty to advise her of the right to abort her pregnancy.

██ A wrongful life cause of action is a cause of action " '*brought by the infant* alleging that, due to the negligence of the defendant, birth occurred . . . .' [Citation.]" (*Gami v. Mullikin Medical Center* (1993) 18 Cal.App.4th 870, 877 [22 Cal.Rptr.2d 819] (*Gami*).) A " 'wrongful birth' " cause of action is the corresponding action brought by parents seeking damages for the birth of the child. (*Ibid.*, fn. 11.)

Normally, the gravamen of a plaintiff's wrongful life action is that the plaintiff has a genetic defect and, but for the doctor's negligence, the plaintiff would not have been born and thus would not have had to suffer the defect. (*Gami, supra*, 18 Cal.App.4th at p. 877.) "Wrongful life" is a form of a medical or professional malpractice action. "[A]s in any medical malpractice action, the plaintiff must establish: '(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.' " (*Ibid.*, quoting *Budd v. Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433].)

A wrongful life action is derived from California's recognition of "an impaired child's right to recover damages for 'wrongful life.' [Citation.] The essence of a wrongful life action is that 'if defendants had performed their jobs properly, [plaintiff] . . . would not have been born at all.' [Citation.] In such a case, an impaired child may recover special damages for the extraordinary expenses necessary to treat the hereditary ailment from which he or she suffers. [Citation.]" (*Galvez, supra*, 88 Cal.App.4th at pp. 1419–1420.)

██ An infant may maintain a "wrongful life" action for special damages when the defendant has "failed to diagnose and warn the parents of the probability that an infant will be born with a hereditary ailment or disability and the infant is in fact born with that ailment." (*Foy v. Greenblott* (1983) 141 Cal.App.3d 1, 14 [190 Cal.Rptr. 84] (*Foy*).)

██ Plaintiffs in the instant case are unable to establish both of these elements. There is no evidence of any basis upon which Dr. Lopez should

have discouraged and prevented mother's pregnancy. Prior to plaintiffs becoming viable fetuses, there is no evidence plaintiffs had "any hereditary trait or other physiological condition which should have led respondents to predict that a child conceived by her would be born impaired." (*Foy, supra,* 141 Cal.App.3d at p. 14.)

In *Gami, supra,* 18 Cal.App.4th 870, the court reversed dismissal of a child's action for medical negligence, holding that the plaintiff could amend to allege a viable wrongful life action based on negligent genetic testing. (*Id.* at p. 883.) The plaintiff was born with birth defects that would have been detected had the defendant medical providers informed the mother of the need for a second blood sample for AFP testing.

Unlike in *Gami,* the instant case does not involve any alleged failure to perform genetic testing that might have revealed hereditary defects. Nor was there any indication, during the time in which mother had a right to voluntarily abort plaintiffs, that plaintiffs had any defects that were substantially certain to occur. Dr. Lopez thus had no duty to advise mother that she had a right to abort plaintiffs.

Furthermore, after mother began experiencing significant complications during her pregnancy, under section 123468, it would have been improper for Dr. Lopez to advise mother that she had a right to an abortion since plaintiffs were viable fetuses.

Section 123468 provides: "The performance of an abortion is unauthorized if either of the following is true: [¶] (a) The person performing or assisting in performing the abortion is not a health care provider authorized to perform or assist in performing an abortion pursuant to Section 2253 of the Business and Professions Code. [¶] (b) *The abortion is performed on a viable fetus,* and both of the following are established: [¶] (1) In the good faith medical judgment of the physician, the fetus was viable. [¶] (2) In the good faith medical judgment of the physician, continuation of the pregnancy posed no risk to life or health of the pregnant woman." (Italics added.)

In support of Dr. Lopez's motion for summary judgment is the declaration of expert medical witness, Dr. Blake, board certified in obstetrics and gynecology and in maternal/fetal medicine. Dr. Blake stated in his declaration that, based on a review of plaintiffs' and mother's medical records, as well as various deposition testimony: ". . . Dr. Lopez at all times complied with applicable standards of practice in regards to his care and treatment of Janet Munguia during this pregnancy. . . . Dr. Lopez was never obligated by the standard of care to offer Ms. Munguia the option of abortion or fetal reduction. From the time Dr. Lopez first saw Ms. Munguia on December 22,

2000 up until the time she presented to Pomona Valley Hospital Medical Center on March 27, 2001, Ms. Munguia's pregnancy was progressing in a normal fashion without any evidence of a potential complication. . . . Although it was certainly appropriate for Dr. Lopez to discuss the risks inherent in a twin gestation with Ms. Munguia, as he did on December 22, 2000, he was never mandated by the standard of care to discuss the options of abortion or fetal reduction."

Dr. Lopez noted that it would have been below the standard of care for him to offer an abortion on or after March 27, 2001. Dr. Lopez stated: "[A]t the time Ms. Munguia was admitted to Pomona Valley Hospital Medical Center on March 27, 2001, she was 24-3/7 weeks pregnant. A fetus is considered to be viable at 24 weeks. Additionally, on March 26, 2001, Dr. Curran determined that the estimated fetal weight of each fetus was in excess of 669 grams. A fetus is considered to be viable once fetal weight exceeds 500 grams. Therefore, it would have been below the standard of care for Dr. Lopez to offer an abortion or fetal reduction at this time."

Dr. Blake further stated that, in his opinion, to a reasonable degree of medical probability, no act or omission to act by Dr. Lopez caused or contributed to any injury sustained by plaintiffs. Dr. Lopez explained that "It is well understood within the medical community that babies can be born with cerebral palsy in the absence of physician negligence. There was no way, from December 22, 2000 to March 27, 2001, that a physician practicing within the standard of care could or should have suspected that Ms. Munguia's pregnancy would be complicated by pre-term rupture of membranes followed by pre-term labor, followed by the premature delivery of her twin babies. There was no test or examination that Dr. Lopez could have performed that would have alerted him to this unfortunate outcome. . . . [F]rom December 22, 2000 to March 27, 2001, Ms. Munguia's pregnancy progressed in an entirely normal fashion, without evidence of any complication and that Dr. Lopez' care and treatment of Ms. Munguia was, at all times, well within applicable standards of practice."

Dr. Blake's declaration provided sufficient evidence to justify summary judgment in Dr. Lopez's favor on the ground Dr. Lopez did not have a duty to advise mother of the right to an abortion.

D. *Plaintiffs Failed to Raise a Triable Issue of Fact Concerning Duty*

Once Dr. Lopez met his burden of establishing that he did not owe mother a duty to advise her of the right to an abortion, it was incumbent upon plaintiffs to demonstrate that there remained triable issues of material fact as to the duty element.

In opposing Dr. Lopez's summary judgment motion, plaintiffs relied on the declaration of Dr. Williams, board certified in obstetrics and gynecology and in maternal/fetal medicine. Dr. Williams stated in his declaration that women, "as with Ms. Munguia, are at greater risk for complications (prematurity, etc.) when their last pregnancy was more than 120 months earlier (five years)."[3] According to Dr. Williams, this was an additional risk factor which Dr. Lopez did not mention.

Dr. Williams further stated that a page from mother's PV Hospital chart (exhibit 3) stated: " '2-27-01. Diagnosis: Intrauterine pregnancy, 20 weeks <u>vaginal bleeding</u>, discharge OB observation.' (Emphasis added.)"[4] Dr. Williams noted that Dr. Lopez inaccurately stated in his declaration that the medical record said that, on February 27, mother was seen for "questionable discharge," whereas the record states "vaginal bleeding." Dr. Williams added, "The diagnosis of bleeding is of far greater maternal-fetal significance than would be mere 'questionable discharge.' "

Dr. Williams also noted that a copy of the American College of Obstetricians and Gynecologists' (ACOG) Abortion Policy (exhibit 4), stated: " 'A pregnant woman should be fully informed [by the clinician] about <u>all</u> options, including . . . abortion.' "[5] Dr. Williams added, the ACOG policy also stated: " 'If abortion is to be performed, it should be performed safely and as early as possible.' "

Dr. Williams concluded in his declaration that under the accepted standard of care, as manifested in the ACOG abortion policy, Dr. Lopez should have raised the option of abortion, particularly in light of mother's vaginal bleeding on February 27, 2001, and based on her clinical history, emotional instability, and "repeat[ed] expressions of not wanting to complete the pregnancy . . . ." According to Dr. Williams, Dr. Lopez's failure to do so constituted care below acceptable standards of obstetrical care, and had Dr. Lopez advised mother of her right to an abortion, she would have accepted the option.

An expert's opinion is only as good as the facts upon which it is based. (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510–511 [11 Cal.Rptr.3d 653].) Dr. Williams's opinion is thus only as good as the facts upon which it is based, and the facts do not support his opinion that Dr. Lopez had a duty to advise mother of the right to an abortion.

---

[3] 120 months equates to 10 years.

[4] The document actually states: "IUP 20 WKS, TWINS, VAGINAL BLEEDING, DISCHARGE OB OBSERVATION."

[5] This is a quotation from Dr. Williams's declaration, quoting the ACOG policy.

Williams based his opinion on the ACOG abortion policy, particularly paragraphs 5 and 7, and the PV Hospital document stating that on February 27, 2001, mother was admitted to PV Hospital for vaginal bleeding. Neither is sufficient to support the conclusion that Dr. Lopez had a duty to advise mother of her right to an abortion. The PV Hospital document does not show that Dr. Lopez should have diagnosed and warned mother of the probability that plaintiffs would be born with a hereditary ailment or disability and plaintiffs were in fact born with that ailment. (*Foy, supra*, 141 Cal.App.3d at p. 14.)

Mother's vaginal bleeding on February 27, which according to the medical records was not serious and may have been from a scratch, did not trigger a duty by Dr. Lopez to advise mother of the right to an abortion. According to the medical records, mother was discharged from PV Hospital the same day and her examination the next day by Dr. Lopez revealed that she and plaintiffs were doing well. Prior to plaintiffs becoming viable fetuses, there was no evidence plaintiffs had "any hereditary trait or other physiological condition which should have led respondents to predict that a child conceived by [mother] would be born impaired." (*Foy, supra*, 141 Cal.App.3d at p. 14.)

The ACOG abortion policy relied on by Williams is also of little, if any, import here since it concerns what a physician should discuss when providing informed consent to a patient considering terminating her pregnancy. The ACOG abortion policy does not state that pursuant to applicable medical standards Dr. Lopez was required to advise mother of the right to an abortion when there was no indication plaintiffs had, or might have, significant physical defects or abnormalities.

Because Dr. Williams's declaration is not founded on anything that would support the conclusion that Dr. Lopez had a duty to advise mother of her right to an abortion, plaintiffs failed to refute that Dr. Lopez had no such duty. There being no duty, plaintiffs cannot prevail on their professional negligence and wrongful life claims, and summary judgment was properly granted.

4. Plaintiffs' Requests for Sanctions, IME Ruling, and Disqualification of the Trial Judge[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 997.

## 5. Disposition

The judgment is affirmed. Plaintiffs are ordered to pay Dr. Lopez's costs on appeal.

Hollenhorst, Acting P. J., and Miller, J., concurred.

On November 8, 2007, the opinion was modified to read as printed above.